[No. A131616. First Dist., Div. One. Dec. 21, 2011.]

EDEN TOWNSHIP HEALTHCARE DISTRICT, Cross-complainant and Appellant, v.
SUTTER HEALTH et al., Cross-defendants and Respondents.

COUNSEL

Pillsbury Winthrop Shaw Pittman, Kevin M. Fong, Christopher R. Rodriguez and Darcy L. Muilenburg for Cross-complainant and Appellant.

Pamela Allen and Brendan White for California Nurses Association as Amicus Curiae on behalf of Cross-complainant and Appellant.

Meyers, Nave, Riback, Silver & Wilson, J. Scott Smith and Jayne W. Williams for City of San Leandro as Amicus Curiae on behalf of Cross-complainant and Appellant.

Kamala D. Harris, Attorney General, Manuel M. Medeiros, State Solicitor General, Douglas J. Woods, Assistant Attorney General, Constance L. LeLouis and Scott Hallabrin, Deputy Attorneys General, as Amicus Curiae on behalf of Cross-complainant and Appellant.

DLA Piper, Stephen Lindsay Goff, Marcia L. Augsburger and Ashley H. Joyce for Cross-defendants and Respondents.

OPINION

**DONDERO, J.**—As part of an agreement with the Eden Township Healthcare District (the District) to upgrade Eden Hospital (Eden), Sutter Health (Sutter) committed to spending $300 million to construct a replacement hospital for Eden. Sutter also planned to exercise an option it had acquired under the agreement to purchase San Leandro Hospital (SLH) and convert it from an

acute care emergency service facility to an acute rehabilitation center. The District refused to convey SLH. An arbitrator ruled in favor of Sutter. The District then filed a lawsuit contending the underlying agreement is void due to a conflict of interest that allegedly arose because of the roles two individuals played in negotiating the agreement.

Cross-complainant the District appeals from the trial court's order granting summary judgment to cross-defendants Sutter and Eden Medical Center (EMC) (collectively referred to as respondents), and denying the District's motion for summary adjudication. The District claims the trial court erred in concluding certain agreements made by the parties are not void under the conflict of interest law as stated in Government Code section 1090 et seq. (section 1090).[1] We affirm because an analysis of the facts and, specifically, the alleged financial interest involving George Bischalaney and Dr. Francisco Rico discussed in this opinion do not demonstrate a conflict of interest as defined in section 1090.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. *Parties and Actors*

The District is a public agency established in 1948 pursuant to California's Local Health Care District Law (Health & Saf. Code, § 32000 et seq.). The mission of the District is to "fulfill the function of protecting the public health and welfare by furnishing hospital services [and] provid[ing] for the public health and welfare . . . ." (*Talley v. Northern San Diego Hosp. Dist.* (1953) 41 Cal.2d 33, 40 [257 P.2d 22], overruled on other grounds in *Muskopf v. Corning Hospital Dist.* (1961) 55 Cal.2d 211, 213 [11 Cal.Rptr. 89, 359 P.2d 457].) The District's operations are overseen by a board comprised of five publicly elected members. The board appoints key executives to run the day-to-day operations of the District. Prior to 1998, the District owned and operated multiple hospitals in Alameda County, including Eden in Castro Valley.

Sutter is a California nonprofit public benefit corporation. Sutter does not own any hospitals. The 24 hospitals with which Sutter is affiliated are owned by other nonprofit public benefit corporations. Sutter is a "member" of each of these nonprofit public benefit corporations, including EMC.

EMC is a California nonprofit corporation that was formed to operate Eden for the District. EMC also operates SLH, which is a general acute care

---

[1] Government Code section 1090 prohibits public officials and employees from having a financial interest in contracts they make in their official capacities. All subsequent statutory references are to the Government Code except as otherwise specified.

hospital with an emergency services department. EMC currently leases SLH from the District. EMC is owned not by shareholders, but by its two members. The District is the "Community Member" of EMC, and Sutter is its "General Member." During the time period relevant to this lawsuit, EMC had 11 voting directors, five of whom were the members of the District's board.

Bischalaney is the president and chief executive officer (CEO) of EMC, a position he has held since 1998.[2] He also served as the District's CEO from January 1998 through June 2008. During the time period relevant to this lawsuit, he earned an annual salary in excess of $200,000 from EMC. He did not receive any salary in connection with his District position.

Between 2002 and 2008, Rico was a member of the District's board of directors. Rico holds an ownership interest in Alameda Anesthesia Associates Medical Group (AAAMG). Since 1986, AAAMG has been the sole provider of anesthesia services at Eden. Since 2004, AAAMG has also been the sole provider of such services at SLH. According to the president and CEO of AAAMG, a closure of SLH would represent a "significant and material threat" to AAAMG's business plan and model.

## II. *History of Agreements*

In 1997, Sutter purchased Eden from the District for $30 million, plus an assumption of approximately $40 million of District debt. Sutter also invested approximately $65 million in improvements to the hospital campus, including the purchase of adjoining property to expand. Pursuant to a 1997 memorandum of understanding between the District and Sutter (the 1997 MOU), Eden's assets were transferred to EMC, then known as "NewCo." Under a contemporaneous management services agreement (the 1997 MSA), EMC agreed to provide administrative services to the District.

By the early 2000's, Eden, which was built in the 1950's, faced the prospect of closure because the facility did not meet current seismic code requirements. To address this problem, the District entered into an agreement in 2004 (the 2004 Agreement) by which EMC agreed to spend at least $262 million to construct a new hospital to replace Eden. Around this time, the District purchased SLH from a third party and leased it to EMC, on the condition that EMC maintain general acute care services at SLH for three years. Sutter guaranteed EMC's obligations under the 2004 Agreement. The 2004 Agreement further provided that if the replacement hospital was not operational by December 2011, EMC would purchase SLH at a price equal to $35 million, minus straight line depreciation.

---

[2] As president and CEO of EMC, Bischalaney served as the 11th member of the EMC board with voting rights.

In 2006, Sutter notified EMC's board, including the five District board members, that it would not build the contemplated replacement hospital. In November 2006, the District notified respondents that they were in breach of their contractual obligation to the District to construct the replacement hospital. The District claimed Sutter's notification amounted to an anticipatory breach and threatened to sue Sutter for $262 million if it did not provide "adequate written assurance" that it would construct the replacement hospital.

On November 24, 2006, Bischalaney informed the District that the notice of anticipatory breach to respondents created a conflict that required him to recuse himself from any decisionmaking relating to the anticipated litigation between the District and respondents. In part, he noted the 1997 MSA "prohibits any [EMC] employee, such as myself, from participating in any District decision that could have a material financial effect upon [EMC] or [Sutter]."

Rather than litigate the dispute, the parties commenced negotiations on a new contractual arrangement. Bischalaney actively participated in the negotiations as a representative of EMC's negotiating team. He attended meetings between the parties and otherwise acted as a lead negotiator for EMC. The committee that formally represented the District in the negotiations consisted of outside counsel Craig Cannizzo,[3] Dr. Rajendra Ratnesar (a District board member), Rico, and outside consultants Steven Hollis and Cynthia Lee.

Cannizzo, Hollis, and Lee all subsequently attested that Bischalaney did not participate in the negotiations on behalf of the District. While Bischalaney, as one of the negotiators for EMC, did provide certain information, thoughts, and ideas to the District's negotiating team, he did not attempt to influence the District's board of directors to enter into the 2008 agreements. For example, he was sometimes asked to provide history and background to new District board members.[4] He was often excused from executive sessions of the District's board when it discussed the negotiations. Cannizzo never indicated to Bischalaney that he thought Bischalaney was acting on behalf of the District in the negotiations.

The negotiations ultimately resulted in a series of related agreements, including a new memorandum of understanding and an amended and restated lease and hospital operations agreement (the 2008 Lease), which were signed by the parties in March 2008 (collectively, the 2008 Agreements). Under the

---

[3] Cannizzo represented the District as its legal counsel for approximately 17 years, until 2009.

[4] We note that prior to his appointment as the CEO of EMC, Bischalaney was Eden's chief financial officer, a position he had held since the early 1980's. Thus, his knowledge of matters pertaining to Eden and the District is doubtless quite extensive.

2008 Agreements, Sutter committed to spending $300 million to construct the replacement hospital, secured by a $260 million escrow deposit. Additionally, the provision in the 2004 Agreement that had called for the District to sell SLH to Sutter was converted into an option for Sutter to purchase. The 2008 Agreements also required the District board members to resign as directors of EMC six months after a notice of commencement of construction of the new hospital had been delivered. Rico negotiated, voted to approve, and signed the 2008 Agreements in his official capacity as a board member for the District.

Construction of the replacement hospital began on July 15, 2009.

On July 27, 2009, Sutter exercised its option to purchase SLH. Sutter announced that after it acquired title it planned to lease SLH to another party in order to convert the facility from an acute care emergency services hospital to an acute rehabilitation hospital. According to the District's brief on appeal, "a newly constituted District board determined that it was not in the best interests of the citizens served by the District to allow [SLH] to be transferred to Sutter and closed as a provider of emergency care services." The District refused to convey SLH to Sutter, asserting Sutter had breached an obligation to convert the fourth floor of SLH to acute rehabilitation. Sutter then commenced arbitration proceedings against the District.

On October 27, 2009, Sutter filed a complaint against the District for specific performance of a written agreement to convey real property and for damages. The complaint alleges the District refused to proceed with the sale of SLH, in repudiation and breach of the 2008 Lease and of the purchase and sale agreement that was formed upon Sutter's exercise of the option. Sutter indicated it had filed the action to preserve its rights while the dispute was being arbitrated. The complaint seeks specific performance of the purchase and sale agreement, delay damages for breach of contract, constructive trust, and declaratory relief concerning the parties' rights and duties with respect to the transfer of title to SLH.

On December 3, 2009, the parties filed a stipulation to stay the lawsuit pending arbitration. The trial court ordered the action stayed.

On March 8, 2010, the arbitrator issued his decision finding Sutter was entitled to an award of specific performance of its right to a conveyance of SLH. The arbitrator specifically did not rule on the legality of the 2008 Agreements, including the issue of whether any of the agreements had been created in violation of section 1090. The decision preserved the District's right to seek to vacate the award by challenging the validity of the 2008 Agreements.

On March 10, 2010, the District filed its answer to Sutter's complaint. As its first affirmative defense, the District alleged that the contracts underlying the complaint are illegal and invalid under section 1090.

Also on March 10, 2010, the District filed a cross-complaint for declaratory and injunctive relief against respondents. In the declaratory relief action, the District contended that the 2008 Agreements are void under sections 1090 and 1092[5] because certain District board members and executives who participated in the negotiation, drafting, approval, and execution of the 2008 Agreements had a prohibited financial interest therein.

On April 22, 2010, respondents filed their answer to the District's cross-complaint.

On September 15, 2010, the District filed a motion for summary adjudication of its cause of action for declaratory relief, asserting the 2008 Agreements are void under sections 1090 and 1092.

On September 16, 2010, respondents filed a motion for summary judgment. Respondents contended the District could not establish the elements of its causes of action. Respondents also asserted as a complete defense that Bischalaney did not participate in the making of the contract in his official capacity, and that the exception for remote interests as set forth in section 1091, subdivision (b)(1) applies.[6]

On September 24, 2010, respondents filed an amended answer to the District's cross-complaint.

On September 27, 2010, the District filed its opposition to respondents' motion for summary judgment. That same day, respondents filed their opposition to the District's motion for summary adjudication.

---

[5] Section 1092 sets forth some of the consequences of a civil violation of section 1090's rule against conflicts of interest: "(a) Every contract made in violation of any of the provisions of Section 1090 may be avoided at the instance of any party except the officer interested therein. No such contract may be avoided because of the interest of an officer therein unless the contract is made in the official capacity of the officer, or by a board or body of which he or she is a member." Although section 1092 states that such a contract "may be avoided," our courts have interpreted this statutory language to mean that a contract made in violation of section 1090 is void, not merely voidable. (*Thomson v. Call* (1985) 38 Cal.3d 633, 646, fn. 15 [214 Cal.Rptr. 139, 699 P.2d 316] (*Thomson*).)

[6] Section 1091, subdivision (b)(1), provides: "As used in this article, 'remote interest' means any of the following: [¶] (1) That of an officer or employee of a nonprofit entity exempt from taxation pursuant to Section 501(c)(3) of the Internal Revenue Code [citation] or a nonprofit corporation . . . ."

The remote interest exception applies to "officers" of a public body or board, not employees. (§ 1091, subd. (a).)

On November 12, 2010, the trial court filed its order granting respondents' motion for summary judgment on the District's cross-complaint and denying the District's motion for summary adjudication. This appeal followed.

## DISCUSSION

### I. *Standard of Review*

The standard of review for summary judgment is well established. The motion "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) We independently review an order granting summary judgment, viewing the evidence in the light most favorable to the nonmoving party. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143]; *Lackner v. North* (2006) 135 Cal.App.4th 1188, 1196 [37 Cal.Rptr.3d 863].) In performing our independent review of the evidence, "we apply the same three-step analysis as the trial court. First, we identify the issues framed by the pleadings. Next, we determine whether the moving party has established facts justifying judgment in its favor. Finally, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable, material fact issue." (*Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1438 [111 Cal.Rptr.2d 534].) Where "the facts are undisputed, the issue is one of law and the 'appellate court is free to draw its own conclusions of law from the undisputed facts.' [Citations.]" (*Suburban Motors, Inc. v. State Farm Mut. Auto. Ins. Co.* (1990) 218 Cal.App.3d 1354, 1359 [268 Cal.Rptr. 16].)

According to Code of Civil Procedure section 437c, subdivision (p)(2), "A defendant or cross-defendant has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant or cross-defendant has met that burden, the burden shifts to the plaintiff or cross-complainant to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff or cross-complainant may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto."

### II. *Section 1090*

■ Section 1090 provides, in relevant part: "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not

be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members."[7] Section 1090 "codifies the long-standing common law rule that barred public officials from being personally financially interested in the contracts they formed in their official capacities." (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1072 [103 Cal.Rptr.3d 767, 222 P.3d 214] (*Lexin*).) "The common law rule and section 1090 recognize '[t]he truism that a person cannot serve two masters simultaneously . . . .' [Citations.] 'The evil to be thwarted by section 1090 is easily identified: If a public official is pulled in one direction by his financial interest and in another direction by his official duties, his judgment cannot and should not be trusted, even if he attempts impartiality.' [Citation.] Where public and private interests diverge, the full and fair representation of the public interest is jeopardized." (*Id.* at p. 1073.)

■ California courts have held that the conflict of interest prohibitions set forth in section 1090 are to be strictly enforced. (*Thomson, supra*, 38 Cal.3d 633, 652.) This policy provides a strong disincentive to governmental officers who might be tempted to take personal advantage of their public offices (*ibid.*), and furthers the statute's goal of "eliminating temptation, avoiding the appearance of impropriety, and assuring the government of the officer's undivided and uncompromised allegiance." (*People v. Honig* (1996) 48 Cal.App.4th 289, 314 [55 Cal.Rptr.2d 555] (*Honig*), citing *Thomson, supra*, at p. 648.) The consequences of a violation of section 1090 can be quite harsh: "Where a prohibited interest is found, the affected contract is void from its inception [citation] and the official who engaged in its making is subject to a host of civil and (if the violation was willful) criminal penalties, including imprisonment and disqualification from holding public office in perpetuity (§ 1097 . . .)." (*Lexin, supra*, 47 Cal.4th 1050, 1073.)

■ The Legislature has excepted two categories of financial interests from the reach of section 1090, generally referred to as "remote interests" and "noninterests." Section 1091, subdivision (b), defines a series of remote interests and provides that "Where an interest is remote, a board member may comply with section 1090 by making full disclosure of the interest, noted in the entity's official records, and abstaining from voting on the affected contract or influencing other board members in any way." (*Lexin, supra*, 47 Cal.4th 1050, 1073.) ■ This exception applies to officers who are voting members of a public body or board, and not to public employees.[8] Section

---

[7] Section 1090 further defines "district" as "any agency of the state formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries."

[8] Section 1091, subdivision (a), provides: "An officer shall not be deemed to be interested in a contract entered into by a body or board of which the officer is a member within the meaning of this article if the officer has only a remote interest in the contract and if the fact of that

1091.5, subdivision (a) defines a series of noninterests, under which a public officer or employee "shall not be deemed to be interested in a contract."

■ "To determine whether section 1090 has been violated, a court must identify (1) whether the defendant government officials or employees participated in the making of a contract in their official capacities, (2) whether the defendants had a cognizable financial interest in that contract, and (3) (if raised as an affirmative defense) whether the cognizable interest falls within any one of section 1091's or section 1091.5's exceptions for remote or minimal interests." (*Lexin, supra,* 47 Cal.4th 1050, 1074.)

III. *The Trial Court's Ruling*

The trial court granted respondents' motion for summary judgment, concluding "the District's first and second causes of action for a declaration that the 2008 Agreements are illegal and void have no merit, and that the District has not met its burden to show a triable issue of one or more material facts exists as to these causes of action." The court reasoned that "Sutter and EMC have shown that the District cannot establish that Mr. Bischalaney participated in the making of the 2008 Agreements in his official capacity as District CEO, and the District has not met its burden to show a triable issue of material fact exists as to this first element. Sutter and EMC have also shown that Mr. Bischalaney and Dr. Rico did not have a cognizable financial interest in the 2008 Agreements and the District has not met its burden to show, and cannot show, that a triable issue of material fact exists as to this second element."

IV. *Neither Bischalaney nor Rico Had a Financial Interest in the 2008 Agreements*

On appeal, the District asserts Bischalaney participated in the making of the 2008 Agreements, and that both Bischalaney and Rico had a financial interest in these contracts.[9] We focus on the second element of the section 1090 cause of action and conclude the trial court was correct in ruling that neither Bischalaney nor Rico had a cognizable financial interest in the 2008 Agreements. We thus do not address the issue of whether Bischalaney participated in the making of the contracts.

interest is disclosed to the body or board of which the officer is a member and noted in its official records, and thereafter the body or board authorizes, approves, or ratifies the contract in good faith by a vote of its membership sufficient for the purpose without counting the vote or votes of the officer or member with the remote interest." Subdivision (b) goes on to specifically define the 16 interests that constitute "remote interests."

[9] There is no issue regarding Rico's participation in the making of the 2008 Agreements, as he voted to approve them.

## A. *Prohibited Financial Interests*

██ Neither section 1090 nor the statutory scheme (§§ 1090–1097) specifically defines the term "financially interested." Our Supreme Court has stated " '[t]he term "financially interested" in section 1090 cannot be interpreted in a restricted and technical manner.' [Citation.] The defining characteristic of a prohibited financial interest is whether it has the potential to divide an official's loyalties and compromise the undivided representation of the public interests the official is charged with protecting. [Citation.] Thus, that the interest 'might be small or indirect is immaterial so long as it is such as deprives the [people] of his overriding fidelity to [them] and places him in the compromising situation where, in the exercise of his official judgment or discretion, he may be influenced by personal considerations rather than the public good.' [Citations.]" (*Lexin, supra*, 47 Cal.4th 1050, 1075.) ██ The focus of section 1090 is to avoid the conflict that is created when public officers or employees stand to receive pecuniary benefits from transactions made by them in their official capacities: "Put in ordinary, but nonetheless precise, terms, an official has a financial interest in a contract *if he might profit from it.*" (*Honig, supra*, 48 Cal.App.4th 289, 333, italics added.)

Appellate courts have also stated "In considering conflicts of interest we cannot focus upon an isolated 'contract' and ignore the transaction as a whole." (*Honig, supra*, 48 Cal.App.4th 289, 320.) The opinion in *Honig* explains that we " 'must disregard the technical relationship of the parties and look behind the veil which enshrouds their activities in order to discern the vital facts. [Citation.] However devious and winding the trail may be which connects the officer with the forbidden contract, if it can be followed and the connection made, a conflict of interest is established.' [Citation.]" (*Id.* at p. 315.)

## B. *Bischalaney*

In arguing that Bischalaney had a prohibited financial interest in the 2008 Agreements, the District claims his status as EMC's salaried CEO constitutes a " 'paradigmatic conflict of interest' " under *Lexin*. The District also relies on *Stockton P. & S. Co. v. Wheeler* (1924) 68 Cal.App. 592 [229 P. 1020] (*Stockton*), and a 1995 Attorney General opinion. (78 Ops.Cal.Atty.Gen. 362 (1995).) As we discuss below, these opinions are distinguishable from the facts of present case.

The parties agree as to the essential facts regarding Bischalaney's alleged financial interest. There is no dispute that his sole potential interest in the 2008 Agreements is the salary that he receives as EMC's CEO. The District does not allege the 2008 Agreements conferred any other expectation of

personal benefit to him, either directly or indirectly. While it is undeniable that employees have a financial interest in their salaries, the District has not shown that the contracts at issue here have any direct or indirect nexus to Bischalaney's compensation. Accordingly, we conclude he did not have a prohibited financial interest in the 2008 Agreements.

### 1. Salary as a Prohibited Financial Interest

■ In *Lexin*, the Supreme Court considered whether a group of city employees who were also trustees of the board that administered the city's retirement system had violated section 1090 by voting to authorize an agreement allowing the city to limit funding of its retirement system in exchange for agreeing to provide increased pension benefits to city employees, including the defendants. (*Lexin, supra,* 47 Cal.4th 1050, 1062.) The court stated that under section 1090, the defendant city employees' circumstances constituted "a potential conflict of interest; indeed, it is a paradigmatic conflict of interest." (*Lexin, supra,* at p. 1075.) The court further observed: "We and the Courts of Appeal have long recognized that where public officials on behalf of a public entity participate in making a contract with a second entity for which they work, the scenario poses at least the risk that the officials will be compromised by serving 'two masters.' " (*Ibid.*) The court reasoned the city employees had two potential conflicts of interest: (1) an interest in their employment status, and (2) an interest in enhanced pension compensation arising from the potential enhancement to their future benefits. (*Id.* at pp. 1075–1076.)

As to the first potential conflict of interest, the court in *Lexin* addressed the legislative history of the government salary "noninterest" exception (§ 1091.5, subd. (a)(9)) and concluded "if the contract involves no direct financial gain, does not directly affect the official's employing department, and is only with the general government entity for which the official works, the interest is a minimal or noninterest under section 1091.5(a)(9) and no conflict of interest prohibition applies." (*Lexin, supra,* 47 Cal.4th 1050, 1081.) Section 1091.5, subdivision (a)(9), defines this noninterest as "That of a person receiving salary, per diem, or reimbursement for expenses from a government entity, unless the contract directly involves the department of the government entity that employs the officer or employee, provided that the interest is disclosed to the body or board at the time of consideration of the contract, and provided further that the interest is noted in its official record." While this exception does not apply to our facts because Bischalaney's employer is not a governmental entity, we nevertheless find it informative.[10]

---

[10] Section 1091, subdivision (b)(1), provides that a "remote interest" includes that of an employee of a nonprofit entity, which would include EMC. This exception applies to officers who are members of a government body or board and only if the officers recuse themselves

Because there is no corresponding statutory exception for nongovernmental salaries, we recognize the Supreme Court's discussion in *Lexin* could arguably be read to suggest that a financial conflict of interest always exists when a public employee receives a salary from another contracting party that is not also a government entity. However, under the facts of *Lexin*, it is clear that the defendant city employees were set to receive a personal benefit from the transaction in the form of enhanced retirement benefits. Thus, the court had no occasion to consider whether the government salary exception need be invoked in situations in which a contract does not confer any tangible financial benefit to a public employee.

In *Stockton, supra*, 68 Cal.App. 592, the other case the District relies on, the appellate court held that a city council member's employment with a private entity that sought to render services to the city constituted a financial interest under section 1090. (68 Cal.App. at pp. 602–603.) The contract at issue clearly provided a financial benefit to the employer as it involved the performance of the plumbing, heating, and ventilating work for the city's civic auditorium. (*Id.* at p. 594.) Thus, the money paid by the city would have facilitated the employer's payment of salaries, thereby conferring a specific financial benefit to the council member-employee: "While it may truly be said that he would not derive direct pecuniary gain from the contract, he certainly would indirectly be so benefited, since upon the success of petitioner's business financially primarily depends the continued tenure of his position and the compensation which he receives for performing the service required of him as the foreman of the department referred to." (*Id.* at p. 602.)

The facts of *Stockton* are distinguishable from the present case.[11] In particular, we note the District does not fully explain how the 2008 Agreements themselves confer any financial benefit, direct or indirect, to Sutter or EMC let alone to Bischalaney.[12] The District argues only that the 2008 Agreements "had an impact on the continuity" of EMC's operations at Eden and SLH, thereby ensuring "the continued stewardship of Mr. Bischalaney and his salary as CEO of EMC." These assertions are somewhat vague. Presumably, any contract entered into by EMC will have "an impact" on its continuity. In any event, when compared to the contract at issue in *Stockton*, the 2008 Agreements do not provide EMC with an analogous *pecuniary* gain. Additionally, there is nothing in this record to support the inference that the

---

from participating in the making of the contract. It does not apply to public employees. Accordingly, this exception also is not applicable to Bischalaney.

[11] We also note the inquiry in *Stockton* turned on whether a contract was void under a city charter (*Stockton, supra*, 68 Cal.App. 592, 596–600), and that the case predates the 1963 revision to section 1090 adding "financially" to the statute. (See *Fraser-Yamor Agency, Inc. v. County of Del Norte* (1977) 68 Cal.App.3d 201, 214 [137 Cal.Rptr. 118].)

[12] Amicus curiae California Nurses Association's request for judicial notice of various tax returns (filed Aug. 8, 2011) is denied as these materials were not before the superior court.

2008 Agreements bear any relationship to Bischalaney's continued employment with EMC. In particular, there is no evidence in the record that his employment status was ever discussed; nor is there evidence that Bischalaney urged the continuation of his position with any of the entities as part of the 2008 Agreements.

Similarly, the 1995 Attorney General opinion cited by the District concerned the ability of a city council to continue to contract with the county sheriff for law enforcement services, where one of the council members was employed as a sheriff's deputy chief. (78 Ops.Cal.Atty.Gen., *supra*, at pp. 362, 368.) The opinion notes, "If the prospective Yucaipa councilman were employed by a private entity, an agreement with such entity by the city would be prohibited under the general terms of section 1090." (*Id.* at pp. 368–369.) The 2008 Agreements do not involve contracts for services to be rendered to the District. Thus, this opinion also does not apply to our facts.

Our facts also contrast with those at issue in *Honig, supra*, 48 Cal.App.4th 289. In *Honig*, the jury convicted the state superintendent of public education of violating sections 1090 and 1097 when he arranged contracts between the State Department of Education and a number of school districts to pay the salaries of certain educators employed by a nonprofit entity which also employed the defendant's wife. In determining the defendant's financial interest in the contracts, the court considered the operation of the entire arrangement, including how the defendant funneled money from the State Department of Education to the school districts, which then paid the educators working for the wife's employer. This, in turn, allowed the wife's employer to pay her salary and pay rent to the defendant. (*Honig*, at pp. 320–321.) The District has not shown such a pathway exists that would trace any financial benefit arising out of the 2008 Agreements to Bischalaney. The necessary links in the evidentiary chain are simply missing.

Here, the underlying dispute arose only after Sutter exercised its option to purchase SLH under the 2008 Lease. Sutter was therefore intending to provide monetary compensation to the *District* in exchange for the property. Sutter was not seeking to render services to the District, nor to secure any public money or benefit. The District does not claim it will be adversely affected, from a *financial* standpoint, if the SLH sale is completed.[13] Indeed, as best we can discern, the District's main issue with the transaction is based

---

[13] Additionally, the District does not explain how the 2008 Agreements could be deemed void under section 1090 without the 2004 Agreement also being void, though at oral argument the District's counsel noted the statute of limitations for a section 1090 action has expired with respect to the 2004 Agreement. Bischalaney was the District's CEO and was employed by EMC when both agreements were entered into and there is nothing in the record to suggest he recused himself from the making of the 2004 Agreement. Curiously, the District has no complaint regarding Bischalaney's alleged "dual role" under the 2004 Agreement.

on public policy concerns regarding the loss of emergency room access, and not public finances. This policy concern, standing alone, is not a proper basis for section 1090 liability.[14] (See, e.g., *BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1231 [97 Cal.Rptr.2d 467] ["It is not sufficient that a city council member desires to advocate the position of a campaign supporter; there must be some financial or pecuniary benefit to the governmental official which could sway his or her judgment."].)

## 2. *The Attorney General's Arguments Are Not Persuasive*

■ Amicus curiae the California Attorney General asserts that courts "liberally construe section 1090 to require only a financial 'interest,' [and] not a financial benefit." Language in relevant cases, however, seems to contradict this assertion: "Financial interests prohibited by section 1090 'are not limited to express agreements for benefit and need not be proven by direct evidence. Rather, forbidden interests extend to *expectations of benefit* by express or implied agreement and may be inferred from the circumstances.' [Citation.]" (*Hub City Solid Waste Services, Inc. v. City of Compton* (2010) 186 Cal.App.4th 1114, 1127 [112 Cal.Rptr.3d 647], italics added.) Courts thus generally focus on whether the contract in question could confer some type of pecuniary advantage to the target of a section 1090 inquiry: "Section 1090 is triggered when a public official *receives any profit from a public contract* and includes the acceptance of a bribe in return for influencing the public entity to enter into a particular contract." (*County of San Bernardino v. Walsh* (2007) 158 Cal.App.4th 533, 550 [69 Cal.Rptr.3d 848], italics added.) "The phrase 'financially interested' broadly encompasses anything that would *tie a public official's fortunes* to the existence of a public contract." (*Carson Redevelopment Agency v. Padilla* (2006) 140 Cal.App.4th 1323, 1335 [44 Cal.Rptr.3d 881], italics added.)

■ It is also well established that to be prohibited under section 1090, the public official's financial interest must be related to the contract: "The interest proscribed by Government Code section 1090 is an interest *in the contract.* The purpose of the prohibition is to prevent a situation where a public official would stand to gain or lose something *with respect to the making of a contract* over which in his official capacity he could exercise some influence." (*People v. Vallerga* (1977) 67 Cal.App.3d 847, 867, fn. 5 [136 Cal.Rptr. 429], italics added [fee earned for consulting services prior to the execution of the contract would not constitute a conflict as the evidence supported an inference defendant was to be paid for those services whether or not the contract was consummated].)

---

[14] Amicus curiae the City of San Leandro's request for judicial notice (filed Aug. 8, 2011) is denied. The materials were not before the superior court and are irrelevant to the specific issues on appeal.

The Attorney General claims our courts and the official opinions of the Attorney General "have consistently concluded that when a party contracting with the public agency is a source of income to an agency official who is participating in making the contract, that official is 'financially interested' in the contract." The Attorney General cites to *Thomson, supra,* 38 Cal.3d 633, 645 and footnote 14, *People v. Gnass* (2002) 101 Cal.App.4th 1271, 1303 [125 Cal.Rptr.2d 225] (*Gnass*), and *Miller v. City of Martinez* (1938) 28 Cal.App.2d 364, 370 [82 P.2d 519] (*Miller*). The Attorney General also relies on its own opinion at 86 Ops.Cal.Atty.Gen. 138, 139–140 (2003). In each of these opinions, however, the party who was found to have had a prohibited financial interest received a tangible benefit that arose out of the contract at issue. The Attorney General's broad statement does not withstand close scrutiny under the facts of this case.

In *Thomson*, a council member sold property to a developer who had obtained city approval for a project. The project required the developer to purchase land that would thereafter be conveyed to the city for a park, and the council member was aware that his property would likely be selected for that purpose when the agreement was entered into. (*Thomson, supra,* 38 Cal.3d 633, 644–645.) Thus, the city's contract with the developer indirectly benefited the council member by creating a situation in which he was virtually assured of receiving a personal financial benefit.

In *Gnass*, a city attorney was indicted for having had a financial interest in each of 10 contracts the city made in connection with the issuance of certain bonds. The city attorney had also served as a private attorney for a technically separate joint powers agency that would need a "disclosure counsel"—a lawyer who evaluates risks and prepares a prospectus for potential investors. (*Gnass, supra,* 101 Cal.App.4th 1271, 1279–1282.) The appellate court found these circumstances could support a finding that the attorney had a financial interest in the bond deal because he knew it was likely that he would later be retained to serve as disclosure counsel. (*Id.* at pp. 1282, 1288.) Again, the contracts at issue in *Gnass* created a nexus, albeit an indirect one, between the transaction and the public official's personal financial interests.

In *Miller*, a citizen filed a complaint alleging a city had purchased petroleum products from a company that employed a council member, and in which the council member also held stock. (*Miller, supra,* 28 Cal.App.2d 364, 365–367.) In reversing the order sustaining a demurrer, the appellate court found the complaint properly alleged the council member had a financial interest in the contracts as he would benefit indirectly from the city's contracts with his employer. (*Id.* at p. 370.) In the case before us, however, there is no evidence that Bischalaney will derive any financial benefit arising from the 2008 Agreements. Thus, the cases relied on by the Attorney General are not on point.

■ We note at least one appellate court has held that an existing contract of employment does not automatically result in a disqualifying financial conflict of interest: "Because appellant had an existing contract of employment at the time she was elected, she was not required by the operation of section 1090 to resign either her job or a position on the board. [Citations.] [¶] However, the prohibition of section 1090 would apply if during appellant's term of office the board is called upon *to renew her contract of employment or otherwise change her employment relationship with the district* by promotion or modification of employment benefits." (*Eldridge v. Sierra View Local Hospital Dist.* (1990) 224 Cal.App.3d 311, 321 [273 Cal.Rptr. 654], italics added; see also *Thorpe v. Long Beach Community College Dist.* (2000) 83 Cal.App.4th 655, 664–665 [99 Cal.Rptr.2d 897] [§ 1091.5, subd. (a)(6) permits contracts that maintain the "status quo" of a spouse's government employment, but does not extend to contracts that would involve a promotion and pay increase].) Again, the 2008 Agreements have no tangible impact on Bischalaney's status as EMC's CEO. There is simply no evidence of any change in Bischalaney's salary, benefits, or status in this record. Thus, there is no disqualifying financial conflict of interest.

In the opinion cited by the Attorney General, the Attorney General advised that a city council could not enter into a contract with a law firm, of which a city council member was a partner, to represent the city in a lawsuit even if the law firm would receive no fees from the city for the services and agreed to turn over to the city any attorney fees that might be awarded in the litigation. (86 Ops.Cal.Atty.Gen., *supra*, at p. 138.) While the law firm would not receive any direct compensation, the prospect of economic loss was nonetheless deemed a "financial interest" under section 1090. (86 Ops.Cal.Atty.Gen., *supra*, at p. 140.) Additionally, the possibility of success in the litigation would likely enhance the reputation of the firm and thereby provide an indirect benefit to the council member. (*Id.* at p. 141.) Unlike the council member, Bischalaney is not a partner or shareholder of EMC. There is no evidence to suggest that his compensation will in any way be impacted by the 2008 Agreements.

The Attorney General claims the "mere *prospect* that the official's judgment will be colored because he or she receives income from the party with whom the official's agency is contracting" is enough to invalidate a contract under section 1090, regardless of whether the official receives any direct or indirect benefit from the agreement. While the argument has some appeal, it is flawed. For example, following the Attorney General's rationale, in a criminal prosecution the government would be able to prove a defendant has a prohibited financial interest merely by proving he or she is an employee of a contracting party, regardless of whether the contract had any bearing whatsoever on his or her personal financial circumstances. The burden would then be placed on the defendant to raise as an affirmative defense that one of

the noninterest exceptions under section 1091.5 applies. Extending our hypothetical to the facts of the present case, it appears Bischalaney would be unable to establish an exception, as the salary exception pertains to government employees only, and none of the other noninterest exceptions are relevant.[15] Essentially, the Attorney General would bypass the financial interest element of section 1090 in all cases in which the affected public servant happens to be an employee of a private contracting party, placing such individuals at a disproportionate risk of incurring criminal liability. Private consultants would be reluctant to provide their expertise and advice to government agencies because of the Attorney General's broad view of "financial interest." We do not believe the Legislature could have intended such a result.[16]

 We note the Attorney General finds it significant that the Legislature has not created an exemption in sections 1091 and 1091.5 for the circumstance "where the other contracting party is a source of income to an official but the contract itself provides no financial benefit to that official." We agree the omission is significant. In our view, if the contract itself offers no benefit to the official, either directly or indirectly, then the official is not financially interested in the contract and any explicit legislative exemption for such a circumstance would be unnecessarily redundant. In other words, there is no need to create an exception for a nonexistent financial interest, as section 1090 is intended to pertain only to situations that *do* implicate financial interests. In sum, we conclude the trial court was correct in finding that Bischalaney did not have a financial interest in the 2008 Agreements.

## C. *Rico*

The District also fails to show Rico had a prohibited financial interest in the 2008 Agreements.[17] It is undisputed that Rico planned to cease practicing at Eden and SLH effective January 1, 2008, and that he began thinking of cutting back on his practice in February 2007, when he was 69½ years of age. In late 2007, he informed AAAMG that he had decided to practice exclusively at the Optima Eye Center, an entity that has no connection to EMC or Sutter. With a few isolated exceptions based on special requests from former patients, he did not perform any services at Eden or SLH after 2007. In fact, since 2007 he has received less than $5,000 annually

---

[15] While this case is not a criminal prosecution, we note that courts often reference criminal cases and civil cases interchangeably when discussing the elements of a section 1090 claim.

[16] We note that under the Attorney General's reading of section 1090, persons with specialized expertise, such as Bischalaney, would be discouraged from serving in a public capacity.

[17] We note Rico did abstain from voting on the 2004 Agreement. The fact that he did not abstain in voting on the 2008 Agreements suggests a recognition at the time that he no longer had any quantifiable financial interest in the operations at Eden and SLH.

for these specially requested services, all of which have been performed at Eden and not at SLH. Additionally, his interest in AAAMG is not that of a stockholder. Rico, like all members of AAAMG, had a total of $1,000 worth of shares in the organization. The value of his shares never changed no matter how much AAAMG anesthesiologists earned. He is not salaried and his income is based solely on the work he performs. The funds he has received for the services performed at Eden since 2007 have come entirely from his patients and their insurers, and not from EMC.

Our situation thus contrasts with the facts of *Fraser-Yamor Agency, Inc. v. County of Del Norte, supra*, 68 Cal.App.3d 201, another case the District relies on. In that case, a member of the county's board of supervisors was a shareholder in a corporation that placed insurance policies on behalf of the county. (*Id.* at pp. 208–210.) The appellate court found a proscribed financial interest even though the public officer did not directly benefit from the terms of the contract. The court found it significant that the contract would contribute to the financial health of the contracting party with which the officer was associated even though he did not receive any commissions from the county's insurance business: "His interest in the agency and in any contracts from which it derives a pecuniary benefit is clearly a financial one because the financial success of the agency inures to his personal benefit. Such success, in turn, enhances the value of Fraser's interest in the agency. The record discloses that the volume of business procured and placed by the agency is an important consideration in the agency's relationship with the insurance companies. If the volume of business produced by the agency is profitable the insurance companies pay an amount to the agency on a basis of profit-sharing over and above the ordinary commissions." (*Id.* at p. 215.)

Unlike the official in the *Fraser-Yamor* case, members of AAAMG do not share the proceeds of their own work with other members. The income Rico receives is derived from his patients and their health insurance plans, not from AAAMG, EMC, or Sutter. Further, Rico had no direct financial interest in the 2008 Agreements themselves as the negotiated settlement was between the District and respondents, not AAAMG.[18]

█ In sum, as the undisputed facts demonstrate that neither Bischalaney nor Rico were financially interested in the 2008 Agreements, the District cannot prevail in an action based on section 1090. We thus need not address the parties' remaining arguments.

---

[18] While the District asserts that AAAMG will be financially impacted (albeit negatively) by the change of SLH from an acute services hospital to an acute rehabilitation hospital after Sutter purchases SLH, this change was foreshadowed by the 2004 Agreement, which guaranteed only that Sutter would continue to provide emergency services at SLH until mid-2007.

## DISPOSITION

The judgment is affirmed.

Marchiano, P. J., concurred.

**BANKE, J., Concurring.—**I concur in the opinion and judgment and write separately to further discuss why I agree the government salary "noninterest" exception (Gov. Code, § 1091.5, subd. (a)(9)) provides an appropriate framework for analyzing the conflict of interest issues presented by this particular case.

First, the history of the Eden Township Healthcare District (District), including the creation and operation of Eden Medical Center (EMC), is telling in this regard. "Eden Township Hospital District [is] a governmental entity functioning under The Local Hospital District Law," Health and Safety Code section 32000 et seq.[1] (*Rosner v. Eden Township Hospital Dist.* (1962) 58 Cal.2d 592, 594 [25 Cal.Rptr. 551, 375 P.2d 431].) The "primary purpose" of this law is to protect "the public health and welfare by furnishing hospital services in areas where hospital facilities are for some reason inadequate, especially in those rural districts where hospitals cannot be maintained without extraordinary governmental support." (*Talley v. Northern San Diego County Hosp. Dist.* (1953) 41 Cal.2d 33, 40 [257 P.2d 22].) The law allows the formation of hospital districts by a "favorable vote of a majority of the voters in the district." (*Id.* at p. 38.) Once established, a district is typically run by a five-person board of directors. (§§ 32100, 32100.6.)

Hospital districts can "establish, maintain, and operate" health care facilities. (§ 32121, subd. (j).) To this end, districts have discretion to exercise a broad array of powers, including "any and all . . . acts and things necessary to carry out" their mission. (*Id.*, subd. (k).) They can, for example, levy taxes and issue bonds (§§ 32200–32243, 32316–32321) and enter into employment agreements and service contracts with professional health care providers (§ 32121, subds. (g)–(h)). They also have the option of "delegat[ing] pursuant to a lease of up to 30 years the responsibility of operating and maintaining a district-owned hospital" and may "transfer the assets to a nonprofit corporation 'to operate and maintain the assets.' " (*Marin Healthcare Dist. v. Sutter Health* (2002) 103 Cal.App.4th 861, 868 [127 Cal.Rptr.2d 113], citing §§ 32126, 32121, subd. (p)(1).) " 'The Legislature's stated reason for allowing such transfers [was] to permit local hospital districts "to remain competitive in the ever changing health care environment . . . ." (Stats. 1985, ch. 382,

---

[1] All further statutory references are to the Health and Safety Code unless otherwise indicated.

§ 5, p. 1556.)' " (*Marin Healthcare Dist. v. Sutter Health, supra,* at p. 868, quoting *Yoffie v. Marin Hospital Dist.* (1987) 193 Cal.App.3d 743, 746 [238 Cal.Rptr. 502].)

Pursuant to this law, the District was created in 1948 to build and operate a hospital for Castro Valley and surrounding communities. It built Eden Township Hospital (Eden) during the 1950's and operated the facility through the 1990's. By the 1990's, however, Eden required significant seismic upgrades to remain in operation. The District could not afford the necessary upgrades on its own, so in 1995, it solicited partnering proposals from major health care providers. Catholic Healthcare West, Columbia/HCA, Summit Medical Center, Tenet Healthcare, and Sutter Health (Sutter) each submitted proposals to partner with the District. After extensive analysis and public hearings, the District placed on the ballot, and the voters approved, a detailed measure authorizing the District to enter into a partnering agreement.

As contemplated by, and pursuant to, the voter-approved measure, the District and Sutter entered into a memorandum of understanding (1997 MOU) to form a California nonprofit public benefit corporation called NewCo, which later became known as EMC. The 1997 MOU recited that the District, Sutter and then NewCo could "best serve the health-related needs of District residents by transferring and operating certain of the District's assets under the ownership and direction of NewCo." It also provided the organization of the nonprofit corporation would take place contemporaneously with the closing of the transactions called for by the partnering proposal and the 1997 MOU.[2]

As required by the 1997 MOU and as specified in the nonprofit's bylaws, the public benefit corporation would be owned by two "members," the District and Sutter, and would be governed by an 11-member board of directors. All five of the District's own elected board members would automatically also become board members of the nonprofit, and Sutter, in turn, would appoint five board members, one of whom had to be a physician. Sutter's initial board choices also had to be ratified by the District. The 11th board member would be the CEO (and thus an employee) of the nonprofit. The first CEO would be chosen by the District. Subsequent CEO's would be nominated by the District, subject to the approval of Sutter. The District would also select the initial chair of the board.

A majority of the nonprofit's board members from the District and also those selected by Sutter had to approve a number of significant actions—such

---

[2] As discussed above, while the District itself is empowered to manage and operate its hospital facilities, and for many years managed and operated Eden, it can also delegate these tasks to a nonprofit corporation. (See § 32121, subd. (p)(1).)

as approving operating and capital budgets, approving new hospital programs or services or significant changes to them, and selecting subsequent CEO's. This "block voting" requirement ensured the nonprofit could not take significant actions without the agreement of both the District and Sutter. The proponents of the partnering proposal accordingly assured voters Sutter would not have undue control of the new public interest corporation. The ballot materials emphasized "[t]he new 11-member hospital board will include all five elected District Board members and the CEO of Eden Hospital— a majority. And the District Board must approve the remaining five members." (Original underscoring.)

EMC was thus created and structured to take over the administration and operation of Eden, which had previously been done directly by the District. Hospital workers, for example, ceased to be employees of the District and were offered employment with the nonprofit "upon substantially the same terms and conditions of employment, including wages, benefits and seniority."

The 1997 MOU also allowed the District to procure its own management services from the nonprofit, and the District did so, signing a management services agreement effective in January 1998. The District has paid approximately $250,000 a year to EMC for these services, which have included hiring District personnel, administrative support for the District's board of directors, furnishing information systems, recordkeeping, and administration of employee benefit plans. The 1997 MOU further gave the District a right of first refusal to reacquire assets transferred to the nonprofit upon its dissolution or other similar event.

EMC is therefore an entity unique to the context at hand. In order to obtain the significant financial resources necessary to make Eden hospital, which the District built and is charged with operating, seismically safe, the District created an entity (as permitted by The Local Hospital District Law; § 32000 et seq.) (a) that assumed the District's administrative and operational responsibilities and (b) over which the District retained, during all periods in question, primary control. This control was, and has been, effectuated by having all of the District's own board members also serve as members of EMC's board of directors, the District approving the board members initially selected by Sutter, the District selecting the first board chair of EMC, the District selecting the first CEO of EMC and nominating all future CEO's, and the requirement that any significant action taken by EMC be approved by a majority of the board members supplied by the District.

In sum, throughout the relevant time periods, EMC has effectively functioned as an arm of the District and, although a nonprofit public benefit

corporation, it partakes of the attributes of a governmental entity, including having a significant, departmentalized workforce. Accordingly, a reasoned conflict of interest analysis in this particular case—and one that comports with the Legislature's explication as to what is, and is not, a cognizable conflict that voids a public contract and subjects an individual to felony prosecution—is properly informed by the government salary "noninterest" exception. (Gov. Code, § 1091.5, subd. (a)(9).)

If EMC were a purely governmental entity, there would be no question but that the government salary "noninterest" exception would apply (as the majority opinion notes, we need not and do not decide whether George Bischalaney actually acted as an "official" of the District in connection with its 2008 agreements with EMC). The Supreme Court made it clear in *Lexin*, as the majority opinion explains, that if a contract "involves no direct financial gain, [and] does not . . . affect the official's employing department, and is only with the general government entity for which the official works, the interest is a minimal or noninterest under section 1091.5(a)(9) and no conflict of interest prohibition applies." (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1081 [103 Cal.Rptr.3d 767, 222 P.3d 214].) It cannot have been the intent of the Legislature, in expressly authorizing hospital districts to enter into public-private partnerships to assume the governmental body's management and operational health care responsibilities and to ensure the financial survival of public hospitals, that a different conclusion would inure simply by virtue of the fact these unique entities are only "half" public (although subject to the control of a district, as EMC was here). What is properly examined, then, is the fundamental purpose and substance of the conflict of interest laws. Such analysis, as the majority opinion explains, leads to the conclusion that as to the 2008 agreements, Bischalaney's employment with EMC was a noninterest.

Second, the propriety of taking guidance from the substance of the government salary noninterest exception in this case finds support in the Legislature's enactment of three statutes specifically addressing conflicts of interest in connection with service on the governing boards of hospital districts (Health & Saf. Code, § 32111), county hospitals (*id.*, § 1441.5) and municipal hospitals (Gov. Code, § 37625). These statutes were jointly enacted in 1996 to ensure that health care professionals who work at these hospitals can also serve on their boards, without fear that in so doing, they and the boards on which they serve will be crippled by a conflict of interest.

The Senate Local Government Committee analysis explained the impetus for the legislation as follows: "Municipal hospitals and local health care districts want the most qualified, experienced, and educated governing board member they can find. In some cases, this means seeking out doctors,

pharmacists, and other health care professionals. But when a health care professional sits on a governing board, he or she cannot [under current conflict of interest statutes, including Government Code section 1090] contract with that hospital for services and office space. If confronted with a choice of public service or professional best-interest, public service is often sacrificed." (Sen. Local Gov. Com., Analysis of Sen. Bill No. 1554 (1995–1996 Reg. Sess.) as amended Mar. 18, 1996, p. 4.) "When the Legislature authorized counties to administer Medi-Cal managed care programs with the assistance of health care professionals, it allowed those board members to contract with the hospital subject to certain safeguards (e.g., disclosure, limits on contract terms, vote abstentions). Because municipal and district health care providers want to take advantage of health care professionals' expertise too, [Senate Bill No. 1554] gives their governing board members the same flexibility as the governing boards in Medi-Cal managed care counties, while keeping the Political Reform Act limitations intact."[3] (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1554 (1995–1996 Reg. Sess.) as amended Mar. 26, 1996, p. 4.)

The Senate floor analysis similarly summarized the arguments in support of the legislation: "Municipal hospital districts and local health care districts are encountering difficulties convincing knowledgeable, experienced members to serve on their boards or advisory bodies. Doctors, pharmacists, and health administrators who agree to help run the hospital agency give up [under current law] their ability to contract with that agency for office space, professional services and other items. To make sure that health care professionals can manage public hospitals and maintain their livelihood, health care districts want to give them the same contracting flexibility as the governing board members of Medi-Cal managed care counties." (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 1554 (1995–1996 Reg. Sess.) as amended June 19, 1996, p. 5.)

These statutory provisions thus "provide that no member of a municipal hospital's or health care district's medical or allied health professional staff who is an officer of the municipal hospital or health care district, nor any member of a county hospital's medical or allied health professional staff who is an officer of the board of supervisors, or a board or commission appointed by the board of supervisors for the operation of a county hospital shall be deemed to be financially interested in designated contracts made by the municipal or county hospital or health care district body or board of which the officer is a member, if the officer abstains from any participation in the making of the contract, the officer's relationship to the contract is disclosed to

---

[3] Such legislative history is properly a matter of judicial notice. (See Evid. Code, §§ 452, subd. (c), 459, subd. (a).)

the body or board and noted in its official records, and thereafter the body or board, without any participation by the officer, finds that the contract is fair to the district and in its best interest and authorizes the contract in good faith." (Legis. Counsel's Dig., Sen. Bill No. 1554, 6 Stats. 1996 (1995–1996 Reg. Sess.) Summary Dig., p. 172.) The three designated contracts (e.g., § 32111, subds. (b)(1)–(3), (d)) are those allowing the officer, or a medical group of which he or she is a member, to provide professional services at the hospital and to lease office space from the hospital for providing such services, "provided that similar contracts exist with other staff members and the amounts payable under the contract are no greater than the amounts payable under similar contracts covering the same or similar services" (e.g., *id.*, subd. (b)(1)) or the terms are "no more favorable than those offered any other party who is a member of the district's medical or allied health professional staff" (e.g., *id.*, subd. (b)(3)).

This legislation is of interest here for two reasons. First, it is an express recognition by the Legislature that it is important for health care professionals to be able to serve on public hospital boards, and specifically the boards of the hospitals in which they work, so they can bring their experience and expertise to bear in the management and operation of these hospitals. Second, it indicates the only conflict problem the Legislature discerned in health care professionals serving on such boards—and thus making management and operational decisions about these hospitals—occurs in connection with contracts for their own professional services, made directly with them or their medical groups so they can work at these hospitals. It follows, then, since the Legislature enacted this legislation expressly so health care professionals *can* participate in the management and operation of public hospitals, that the Legislature determined they *can* participate in contracts pertaining to the general management and operation of such hospitals and any asserted "indirect" benefit to them from such contracts is so tangential it is a noninterest.

The 2008 agreements at issue in this case concern the general management and operation of Eden and San Leandro hospitals. The agreements are not contracts made directly with health care professionals (either an administrator or physician) for professional services to be performed in the hospitals' facilities, which would implicate conflict of interest laws. Rather, they are the kind of agreements—pertaining to the *general* operation and management of the District's public hospitals—the Legislature has taken steps to make clear health care professionals who serve on the governing bodies of such hospitals can make, even if they also work at the hospitals on whose boards they serve. Again, given the Legislature's purpose and intent in this regard, the only reasoned conclusion that can be reached here is that neither of the health care

professionals whose actions are in question, Bischalaney or Dr. Francisco Rico, was afflicted with a conflict of interest that precluded them from participating in the 2008 agreements concerning the general operation and management of the District's public hospitals.

Appellant's petition for review by the Supreme Court was denied April 11, 2012, S199758.