Filed 2/13/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MIKE TORRES,<br><br>    Plaintiff, Respondent and Appellant,<br><br>    v.<br><br>THE CITY OF MONTEBELLO et al.,<br><br>    Defendants and Respondents;<br><br>ARAKELIAN ENTERPRISES, INC.,<br><br>    Real Party in Interest, Respondent<br>    and Appellant. | B246515<br>(Consolidated with B246526 & B250851)<br><br>(Los Angeles County<br>Super. Ct. Nos. BS120272) |
| ARAKELIAN ENTERPRISES, INC.,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>THE CITY OF MONTEBELLO et al.,<br><br>    Defendants and Respondents. | (Los Angeles County<br>Super. Ct. Nos. BS138950) |

APPEALS from judgments and an order of the Superior Court of Los Angeles County, James C. Chalfant, Judge. Affirmed.

Miles Law Group, Stephen M. Miles; Law Offices of Frank W. Battaile and Frank W. Battaile for Plaintiff, Respondent and Appellant Mike Torres.

Leibold McClendon & Mann, P.C. and John G. McClendon for Defendants and Respondents City of Montebello and City Council of the City of Montebello.

Bell, McAndrews & Hiltachk, Paul T. Gough, Colleen C. McAndrews, Thomas W. Hiltachk; Gibson, Dunn & Cutcher, Robert E. Palmer, Lauren D. Friedman, Courtney A. Dreibelbis and Thomas Manakides for Real Party in Interest, Respondent and Appellant, and Plaintiff and Appellant Arakelian Enterprises, Inc.

_____

**INTRODUCTION**

The principal issue in this appeal concerns Government Code section 40602's mayoral signature requirement for municipal contracts and whether the mayor's purported refusal to sign a contract duly approved by the city council authorizes the mayor pro tem to sign the contract in the mayor's "absence" under Government Code section 40601. We conclude it does not.

Since 1962, Arakelian Enterprises, Inc. doing business as Athens Services, successor in interest to Athens Disposal Company, Inc. (Athens), has been the exclusive residential waste hauling franchisee for the City of Montebello (the City or Montebello). In 2008, a candidate for the Montebello City Council approached Athens about becoming the City's exclusive commercial waste hauling franchisee as well. The candidate won election to the Montebello City Council and, with his vote, the City Council approved a contract granting Athens an exclusive residential and commercial waste hauling franchise.

2

In the weeks that followed, the Mayor of Montebello, who had voted against the exclusive franchise, refused to sign the contract. The City Attorney advised the Mayor that he had a ministerial duty to execute contracts passed by the City Council under Government Code section 40602. If the Mayor refused to do so, the City Attorney warned, he would be deemed "absent" under Government Code section 40601 and the Mayor Pro Tempore would be directed to execute the contract in his stead. More weeks passed without the Mayor signing the contract, until, at the apparent direction of the City Attorney, the Mayor Pro Tempore signed it.

Plaintiff Mike Torres filed a complaint against the City seeking a writ of mandate to invalidate the contract. The trial court entered judgment for Torres and issued the requested writ, ruling the contract void *ab initio* because it had not been executed by the Mayor as required by Government Code section 40602. On appeal from the judgment as a real party in interest, Athens principally contends the Mayor was appropriately deemed "absent" based on his refusal to carry out his ministerial duty, and the Mayor Pro Tempore was therefore authorized to execute the contract under Government Code section 40601.[1] As we explain, neither the City Attorney nor the Mayor Pro Tempore had the authority to deem the Mayor "absent" under the Government Code. Accordingly, we conclude the Mayor Pro Tempore's signature was ineffective to enter the contract on the City's behalf, and affirm the judgment on this basis.[2]

---

[1] Athens also contends Torres's action was barred by the doctrine of laches. We address this issue below and conclude the trial court properly rejected the laches defense.

[2] Because our resolution of this issue is alone sufficient to affirm the judgment, we do not address Athens's challenge to the trial court's independent ruling that the contract violated Proposition 218. As for Torres's contention that one of the councilmembers had a disqualifying financial interest in the contract under Government Code section 1090 et seq., we address this issue below and conclude the trial court correctly rejected the claim.

In the wake of the trial court's ruling, Athens filed its own complaint against the City seeking a writ of mandate directing the Mayor to execute the contract in accordance with Government Code section 40602. However, in the intervening period between the City Council's approval of the contract and Athens filing its complaint, Montebello voters approved an initiative requiring the City Council to utilize a competitive bidding process to award residential solid waste franchises. Because the residential portion of the contract had not been subject to competitive bidding, the trial court ruled it could not issue the requested writ, and sustained the City's demurrer on that basis. We conclude the trial court's ruling was correct as a matter of law.

Finally, Torres cross-appeals from the trial court's order denying his motion for private attorney general fees under Code of Civil Procedure section 1021.5. The trial court found Torres's attorney fees had been paid entirely by an organization of Athens's waste hauling competitors and, on that basis, concluded private attorney general fees were inappropriate because Torres bore no financial burden in litigating the case. We find no abuse of discretion in this ruling.

## FACTS AND PROCEDURAL HISTORY

Athens or its predecessors have been the exclusive residential waste hauling franchisee in Montebello since 1962. In 2008, Robert Urteaga, then a Montebello City Council candidate, approached Athens about submitting a proposal to become the exclusive commercial waste hauling franchisee for the City. At the time, commercial contracts were handled by several different waste haulers, including Athens and many of its competitors, each of which had a seven-year rolling non-exclusive franchise under the Montebello Municipal Code. Urteaga believed an exclusive contract would be "a good idea for simplicity's sake." Athens contributed to Urteaga's election campaign, and Urteaga ultimately won a seat on the City Council.

4

At its July 9, 2008 regular meeting, the City Council considered the proposed exclusive waste hauling contract. After hearing testimony, the City Council directed its staff to prepare a proposed contract granting an exclusive residential and commercial waste hauling franchise to Athens (the Contract). Athens was to begin performing the commercial portion in 2016, after the existing commercial franchises had been terminated.

At the next regular meeting on July 23, 2008, the City Council considered and approved several modifications to the Contract that were negotiated orally at the dais. The changes included (1) an amendment requiring Athens to pay a $500,000 proposal fee; (2) an amendment requiring Athens to pay the City 7.5 percent of its gross receipts for the collection of commercial solid waste; (3) an amendment eliminating a $2 per customer residential franchise fee; and (4) an amendment establishing $1.99 monthly charge for customers who desired an additional 90 gallon waste bucket.

On August 5, 2008, the City Council approved the Contract by a three-to-two vote. Urteaga, together with the Mayor Pro Tempore, Rosemarie Vasquez, and a third member of the City Council, Kathy Salazar, voted for the Contract.[3] The Mayor, William Molinari, joined by another member of the City Council voted against. Thereafter, the Montebello City Attorney approved the form of the Contract and submitted it to Mayor Molinari for his signature.

---

[3] Torres contends Salazar was financially interested in the Contract inasmuch as Athens had donated money in the past to a non-profit organization that Salazar founded and from which she, at times, drew a salary. Due to this purported financial interest, Torres maintains Salazar was prohibited from voting to approve the Contract in her official capacity and the Contract must therefore be set aside under Government Code section 1090 et seq. We will state the relevant facts related to this contention in our legal discussion of the section 1090 claim.

According to the Mayor, he had the Contract in hand in August and September 2008, but he was unable to confirm that the orally negotiated changes had been properly incorporated. Due to his confusion over the changes, Mayor Molinari asked the City Attorney to place the final Contract on the City Council agenda before he executed it. The City Attorney did not respond to the request.

Contrary to Mayor Molinari's version of events, the City Attorney maintained the Mayor simply refused to sign the Contract because he objected to awarding Athens an exclusive commercial franchise. On August 25, 2008, the City Attorney prepared a memorandum advising the Mayor that he had a ministerial duty to execute the Contract as approved by the City Council. The memorandum admonished, "Your decision to not sign the [Contract] warrants a determination that for purposes of this [Contract] only, you are deemed 'absent' thus vesting in the Mayor Pro-Tem the authority to execute this contract. [¶] I will instruct Mayor Pro-Tem Vasquez to sign the [Contract]. In addition, the contract will have the following notation 'for purposes of this Agreement only, the Mayor is deemed absent from execution and thus Mayor Pro-Tem is authorized to execute this Agreement.' "

The Mayor did not execute the Contract. Though he was physically present at City Hall on September 12, 2008, the Contract was apparently taken from the Mayor's mailbox, altered with the notation proposed by the City Attorney, then signed by the Mayor Pro Tempore. The same day, Mayor Pro Tempore Vasquez issued a statement explaining that she signed the Contract because "the Mayor has declined to execute the agreement negotiated by the City Council and the City Attorney."

In April 2009, Athens paid the City the $500,000 proposal fee set forth in the Contract. In July 2009, Athens began performing the residential waste hauling portion of the Contract. In advance of its performance, Athens purchased four new compressed natural gas garbage trucks at a cost of $1.2 million and provided Montebello residents with new 90-gallon easy-roll automated waste containers at no charge to the residents. The new waste containers cost Athens between $1.5 and $1.7 million.

On April 23, 2009, Torres filed his petition for a writ of mandate to set aside the Contract. Among other things, the petition alleged the Contract was void because the City failed to comply with Government Code section 40602, which requires mayoral execution of all municipal contracts. The City responded with an anti-SLAPP motion, which the trial court denied on August 7, 2009. On October 6, 2009, the City appealed the ruling, staying the trial court proceedings.

In November 2009, Mayor Molinari and Mayor Pro Tempore Vasquez faced reelection. Montebello voters also qualified a recall of City Council members Urteaga and Salazar, resulting in a February 2010 special election. Due in apparent part to the controversy over the City Council's approval of the Contract, Mayor Pro Tempore Vasquez was not reelected and City Council members Urteaga and Salazar were recalled. Mayor Molinari won reelection with the largest share of the vote.

Within a week of the recall, the City abandoned its appeal from the denial of its anti-SLAPP motion and, on October 29, 2010, substituted new counsel to represent it in this action. On May 5, 2011, Torres demurred to the City's original answer. The City responded by filing an amended answer, admitting the material allegations of Torres's petition. Athens filed a motion to strike the City's amended answer, which the trial court denied on July 29, 2011.

On July 27, 2011, the new City Council approved a resolution to place a City-initiated measure on the ballot requiring a public bidding process for all residential solid waste hauling franchises. Montebello's voters approved the "Residential Solid Waste Franchises Initiative" on November 8, 2011, and the Initiative was codified as Chapter 8.14 of the Montebello Municipal Code. Chapter 8.14 prohibits the renewal of existing residential solid waste franchises and requires a competitive bidding process for awarding new franchises. (Montebello Mun. Code, §§ 8.14.030 & 8.14.060.)

7

On July 26, 2012, the trial court granted Torres's petition for writ of mandate. Among other things, the court concluded the Contract was "unlawful and void" because it was not executed by the Mayor in accordance with Government Code section 40601.

Prompted by the trial court's ruling, on August 20, 2012, Athens filed its own petition for a writ of mandate directing the Mayor to execute the Contract in accordance with the Government Code. The court sustained the City's demurrer to the petition without leave to amend. Because the Contract had not been subject to the competitive bidding process mandated by Chapter 8.14 of the Montebello Municipal Code, the court held it could not issue the requested writ.

On March 4, 2013, Torres filed a motion for attorney fees pursuant to Code of Civil Procedure section 1021.5. After granting Athens's request for additional discovery and further briefing concerning the financial burden prong of section 1021.5, the court denied Torres's attorney fee motion. Citing evidence showing Torres's attorney fees had been paid in full by "an organization of Athens' trash hauler competitors," the court concluded "Torres ha[d] not met his burden of showing that his litigation costs transcend his personal interest such that the necessity and financial burden are such as to make an award . . . appropriate."

Athens appealed from the judgment granting Torres's writ petition and the judgment dismissing its complaint against the City. Torres filed a cross-appeal from the portion of the judgment rejecting his Government Code section 1090 claim (see fn. 3, *ante*) and a cross-appeal from the order denying his motion for attorney fees. We consolidated the several appeals for disposition in a single opinion.

# DISCUSSION

1. *The Ruling Rejecting Athens's Laches Defense Is Supported by the Evidence*

As a threshold matter, Athens contends Torres's entire action is barred by the doctrine of laches. "A party asserting laches must show both unreasonable delay and prejudice resulting from the delay. [Citation.] A trial court's ruling regarding laches will be sustained if there is substantial evidence to support it." (*Martin v. Santa Clara Unified School Dist*. (2002) 102 Cal.App.4th 241, 257.) In rejecting Athens's laches defense, the trial court assumed the costs Athens incurred to date in performing the Contract demonstrated prejudice, but concluded Athens failed to establish unreasonable delay by Torres in bringing the mandamus action. The court's ruling is supported by the evidence.

The Contract was ostensibly executed by the Mayor Pro Tempore on September 12, 2008. Seven months later, on April 23, 2009, Torres filed his petition for writ of mandate. In opposing the writ petition, Athens, which had the burden of proof on its affirmative defense, failed to offer any evidence to demonstrate Torres acted unreasonably in waiting to file this action. Instead, Athens relied entirely on a prior ruling by the trial court denying Torres's application for injunctive relief. In denying the application, the court found, inter alia, that Torres had failed to adequately explain his delay in seeking an injunction. Based on this finding, Athens took the position that the initial burden rested with Torres to provide an "explanation for the extraordinary delay in seeking a writ."

The trial court rejected Athens's contentions. With respect to the burden of proof, the court correctly observed that Athens had raised laches as an affirmative defense and "it has the burden" of showing "unreasonable delay for laches purposes." In contrast, the court explained that Torres had the burden of establishing "irreparable harm" in applying for an injunction, and his failure to seek immediate injunctive relief suggested there was no real threat of such injury. In view of these different burdens, the court reasoned that "an unreasonable delay in applying for a preliminary injunction is not the same as an unreasonable delay in commencing and prosecuting a lawsuit." We agree with the trial

9

court.  The denial of Torres's application for injunctive relief did not compel a finding of unreasonable delay for laches purposes.  As Athens failed to offer evidence to establish unreasonable delay, the trial court reasonably rejected its laches defense.[4]

2.      *The Contract Was Not Executed in Accordance with the Government Code; The Trial Court Properly Ruled the Contract Void*

Government Code section 40602 provides, "The mayor shall sign:  [¶] . . . [¶] . . . All written contracts and conveyances made or entered into by the city."[5]  "In the absence of the mayor," section 40601provides, "the mayor pro tempore shall exercise the powers granted [to the mayor] in this chapter."[6]  The trial court concluded the Contract was "unlawful and void" because it was not signed by the Mayor in accordance with the Government Code.  We agree.

---

[4]      Insofar as Athens relies on the subsequent three-year period between Torres filing this case and the trial on his writ petition, the evidence also supports the trial court's findings that Torres reasonably prosecuted the action and much of the delay was "attributable to law and motion practice by other parties."  This included anti-SLAPP motions by the City and an individual defendant, which Athens attempted to join; an appeal from the ruling denying the City's anti-SLAPP motion, which stayed the case until the City abandoned its appeal; the City's amended answer admitting Torres's allegations and Athens's motion to strike the answer.  The trial court found all of this delayed prosecution of the action and reasonably explained why it took so long to bring the case to trial.

[5]      Unless otherwise stated, subsequent statutory references are to the Government Code.

[6]      Under section 40602, a city's "legislative body may provide by ordinance that [a written contract] be signed by an officer other than the mayor."  The City has no such ordinance.  Rather, Montebello Municipal Code section 3.21.060, subdivision B provides that "Contracts for professional/special services in excess of fifty thousand dollars require the approval of the city council *and the signature of the mayor, or in his or her absence, the mayor pro tempore, pursuant to the provisions of Gov. Code Sections 40601 and 40602*."  (Italics added.)

10

a.      *The Government Code prescribes the only method by which a valid municipal contract can be made*

We begin with Athens's contention that section 40602 does not apply because "the Contract imposed **no financial obligation** on the City." As we explain below, the Contract, which imposes a financial obligation on Montebello's constituent residents, is subject to section 40602's mayoral signature requirement, and the authority Athens relies upon is inapposite.

It is undisputed that Montebello is a general law city. The powers of a general law city include "only those powers expressly conferred upon it by the Legislature, together with such powers as are 'necessarily incident to those expressly granted or essential to the declared object and purposes of the municipal corporation.' " (*Irwin v. City of Manhattan Beach* (1966) 65 Cal.2d 13, 20; *Poway Royal Mobilehome Owners Assn. v. City of Poway* (2007) 149 Cal.App.4th 1460, 1472 (*Poway*.) A " ' "general law city . . . must comply with state statutes that specify requirements for entering into contracts. [Citations.]" ' " (*Poway,* at p. 1472.) Thus, "when a statute limits a city's power to make certain contracts to a certain prescribed method and impliedly prohibits any other method, a contract that does not conform to the prescribed method is void and no implied liability can arise for benefits received by the city or for damages caused by it to the other party to the void contract." (*South Bay Senior Housing Corp. v. City of Hawthorne* (1997) 56 Cal.App.4th 1231, 1235 (*South Bay*), italics omitted; *Miller v. McKinnon* (1942) 20 Cal.2d 83, 91-92 (*Miller*).) " 'Under such circumstances the express contract attempted to be made is not invalid merely by reason of some irregularity or some invalidity in the exercise of a general power to contract, but the contract is *void* because the statute prescribes the only method in which a valid contract can be made, and the adoption of the prescribed mode is a *jurisdictional prerequisite* to the exercise of the power to contract at all and can be exercised in no other manner so as to incur any liability on the part of the municipality. Where the statute prescribes the only mode by which the power to contract shall be exercised the *mode* is the *measure* of the power.' " (*Miller,* at pp. 91-92, first and second italics added; *South Bay,* at p. 1235.)

11

In *South Bay*, a developer of low-income senior citizen housing sued the city of Hawthorne for anticipatory breach of a lease and development agreement that had been unanimously approved by the city council. (*South Bay, supra,* 56 Cal.App.4th at pp. 1233-1234.) On appeal from a jury verdict in favor of the developer, the city argued there was no enforceable contract unless it was signed by the mayor in accordance with section 40602. The Court of Appeal agreed, rejecting the developer's argument that section 40602 did not apply to Hawthorne because it was a general law, as opposed to a charter, city. Relying on our Supreme Court's holding in *Miller*, the *South Bay* court observed, "It follows that, by the plain language of the statutes, the City's power to make a contract is limited to the prescribed method and, by necessary implication, that any other method is prohibited—which means that, unless it was signed by the Mayor, the contract with South Bay is void and no implied liability can arise under that contract." (*South Bay,* at p. 1236, citing *Miller, supra,* 20 Cal.2d at pp. 91-92.)

As noted, Athens contends section 40602 does not apply because "the Contract imposed **no financial obligation** on the City," insofar as Montebello citizens pay directly for Athens's services. Athens does not address *South Bay* or *Miller* in advancing this argument. Instead, it relies principally on *City of Orange v. San Diego County Employees Retirement Assn.* (2002) 103 Cal.App.4th 45 (*City of Orange*), wherein the court held that, read together, the language of section 40602 and provisions of a municipal code not at issue here, "do not unambiguously require that every city contract, without exception, be in writing and signed by the mayor." (*City of Orange,* at p. 54.) *City of Orange* is inapposite.

The *City of Orange* court premised its holding on the "general purpose" of section 40602, which, the court stated, was to ensure that expensive municipal decisions are not hastily made. (*City of Orange, supra,* 103 Cal.App.4th at pp. 54-55.) The court held the *city* could enforce an oral option contract that required a retirement association to hold a settlement offer open, reasoning " 'restrictions on a municipality's power to contract . . . are designed to protect the public, not those who contract with the municipality.' " (*Id.* at p. 54.) In that regard, the court explained the oral option contract

12

imposed no financial burden on the city, the sole consideration was the city's agreement to stay litigation while considering the retirement association's settlement offer, and the "litigation standstill would save the city money if the offer were accepted." (*Ibid*.) Under those circumstances, the *City of Orange* court found the purpose of section 40602—to prevent hasty decisions on important public matters—was served by honoring the oral option agreement because it gave the city adequate time to review the settlement offer and secure approval from city officials without fear the retirement association would withdraw the offer. (*City of Orange*, at p. 55.) That is, "Orange had much to gain and little, if anything, to lose from the oral option contract." (*Ibid*.)

  *City of Orange* is readily distinguishable. To begin, contrary to Athens's premise, the Contract here does impose a financial burden on the City insofar as the City's constituent residents are required to pay the rate set by the Contract for residential trash services. As the purpose of section 40602 is to prevent hasty decisions concerning taxpayer funded public finances, we see no difference between a situation in which taxpayers are billed directly for Athens's services versus one in which the City pays Athens then passes the cost along to its residents through a tax, fee or charge. In either case, there is a concern that elected officials will make improvident decisions affecting taxpayers' wallets. The Contract clearly implicates the "general purpose" of section 40602. (*City of Orange, supra,* 103 Cal.App.4th at pp. 54-55.)

  Additionally, unlike in *City of Orange*, here, it is not the City, but Athens—a private entity—that attempts to enforce a contract that does not conform to the Government Code. Because " 'restrictions on a municipality's power to contract . . . are designed to protect the public, not those who contract with the municipality' " (*City of Orange, supra,* 103 Cal.App.4th at p. 54), the Government Code's " 'jurisdictional prerequisite' " must be scrupulously enforced in this case to ensure the public is protected from hasty decisions by elected officials that impact taxpayer finances. (*Miller, supra,* 20 Cal.2d at pp. 91-92.) We conclude the Government Code prescribes the only method by which the City could enter the Contract. (See *ibid.*; *South Bay, supra,* 56 Cal.App.4th at p. 1236.)

13

b.      *The Government Code did not authorize the Mayor Pro Tempore to*
        *sign the Contract*

Having concluded the Contract is subject to the Government Code, we turn to Athens's contention that the Mayor Pro Tempore's signature was sufficient to conform the Contract to the statutory prescriptions.  Under section 40601, the mayor pro tempore is authorized to execute a contract requiring the mayor's signature "[i]n the absence of the mayor."  Athens argues "absence" as used in section 40601 includes not just the mayor's physical absence, but also the mayor's refusal to perform a ministerial duty, such as signing a contract that has been approved by the city's legislative body.  (See § 40602 ["The mayor *shall* sign:  [¶] . . . [¶] . . . All written contracts and conveyances made or entered into by the city"], italics added.)

"Our analysis starts from the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent.  [Citations.]  In determining intent, we look first to the words themselves.  [Citation.]  When the language is clear and unambiguous, there is no need for construction.  [Citations.]  When the language is susceptible of more than one reasonable interpretation, however, we look to a variety of extrinsic aids, including the ostensible objects to be achieved . . . and the statutory scheme of which the statute is a part."  (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1007-1008.)  "The interpretation of an ambiguous statutory phrase may be aided by reference to other statutes which apply to similar or analogous subjects."  (*Id.* at p. 1008.) "[I]t is a well-established rule of construction that when a word or phrase has been given a particular scope or meaning in one part or portion of a law it shall be given the same scope and meaning in other parts or portions of the law."  (*Stillwell v. State Bar* (1946) 29 Cal.2d 119, 123 (*Stillwell*).)

As Athens correctly observes, the word "absence" is not defined by section 40601. Nevertheless, the concept of absence appears elsewhere in the Government Code in relation to the mayor's duties and the mayor pro tempore's authority to act in the mayor's stead.  Section 36802 provides, "The mayor shall preside at the meetings of the council. If he is *absent* or unable to act, the mayor pro tempore shall serve until the mayor *returns*

14

or is able to act." (Italics added.) Like section 40602, section 36802 imposes a ministerial directive—the mayor "*shall* preside at the meetings of the council." (Gov. Code, § 36802, italics added.) Nevertheless, the word "absent" as used in section 36802 is clearly limited to its physical aspect—it authorizes the mayor pro tempore to serve "until the mayor *returns*." (*Ibid.*, italics added.) In view of the analogous subjects addressed by the two statutes, the word "absence" in section 40601 should be given the same scope and meaning as the word "absent" in section 36802. (*Stillwell, supra,* 29 Cal.2d at p. 123.) We agree with the trial court that "absence" as used in section 40601 is limited to the mayor's physical absence.

Our conclusion is bolstered by the lack of any statutory authorization for the actions taken by the City Attorney and Mayor Pro Tempore in this case. While physical absence is essentially a binary concept—the mayor is either physically present or he is absent, absence in the dereliction of a ministerial duty sense advanced by Athens is more amorphous—requiring at a minimum some determination that the mayor has a ministerial duty he refuses to perform. Here, that determination was initially made by the City Attorney, who recommended that the Mayor be "deemed absent" for purposes of signing the Contract. The determination then was apparently ratified by the Mayor Pro Tempore, who, on the City Attorney's advice, purportedly signed the Contract.[7] However, nothing in the Government Code authorized the City Attorney or Mayor Pro Tempore to

---

[7] In support of its earlier anti-SLAPP motion, the City submitted a purported declaration by the Mayor Pro Tempore affirming she signed the Contract after the Mayor was deemed absent. Following her recall by the Montebello voters, the Mayor Pro Tempore invoked her Fifth Amendment right against self incrimination and refused to testify during deposition about her purported signature on the Contract. In view of her refusal to submit to cross-examination, the trial court struck the Mayor Pro Tempore's declaration, and concluded there was "no proof" of who signed the Contract. Notwithstanding the trial court's ruling striking the declaration, Athens contends other evidence compelled a finding that the Mayor Pro Tempore did in fact sign the Contract. As we conclude the Mayor Pro Tempore was not authorized to execute the Contract as a matter of law, we need not address this evidentiary dispute.

15

unilaterally deem the Mayor absent based on their own determination that he had failed to perform a ministerial duty.

On the contrary, the authority to direct the performance of a ministerial act is vested in the courts, which, under Code of Civil Procedure section 1085, are authorized to issue a writ of mandate to a public official "to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station." Thus, while we conclude section 40601 is limited to the mayor's physical absence, this did not leave the City Attorney, the Mayor Pro Tempore or Athens without a means for resolving their dispute with the Mayor over his ministerial duty in this case. As the trial court correctly concluded, those who believed the Mayor was derelict in his duty to sign the Contract could have sought relief from the courts by way of a petition for writ of mandate. They could not, however, circumvent the Government Code's prescriptions by simply deeming the Mayor absent on their own unilateral determination. (Cf. *City of Orange, supra,* 103 Cal.App.4th at pp. 54-55 [section 40602 creates " ' " 'a broad base of authority by requiring [contract] approval by a number of different individuals' " ' "].)

c. *Estoppel does not apply*

Finally, Athens contends the City should be equitably estopped from denying the validity of the Contract. Again, we disagree. As an initial matter, Athens's argument disregards that it is Torres—not the City—that petitioned the court for a writ of mandate to set aside the Contract. As a resident of Montebello, Torres had standing to challenge a City contract that did not conform to the Government Code, and Athens offers no reason why *Torres* should be estopped from challenging the Contract in that capacity.[8]

---

[8]    Athens contends its estoppel argument is nevertheless appropriate because "Torres is just a straw man standing in the shoes of the independent [trash] haulers and City insiders like [Mayor] Molinari." Even if Torres has such a relationship with Athens's competitors and Mayor Molinari, Athens's assertion still does not explain why Torres should stand in *the City's* shoes for purposes of estoppel. In any event, Athens cites no authority for extending estoppel to bar a resident's lawsuit challenging his city's ultra vires action on the ground that the resident is a purported "straw man" for some other interested groups.

16

Moreover, numerous cases hold "estoppel may not be raised against a public entity when it would defeat the public policy of requiring adherence to statutory procedures for entering into contracts." (*Poway, supra,* 149 Cal.App.4th at p. 1476; see, e.g., *Seymour v. State of California* (1984) 156 Cal.App.3d 200, 204 [no estoppel against state based on oral lease when statute required a written lease approved by specified officer]; *State of California v. Haslett Co.* (1975) 45 Cal.App.3d 252, 257-258 [estoppel could not be raised against the state to render effective an oral agreement to enter into a lease when it was not approved by the officer designated by statute]; *Santa Monica Unified Sch. Dist. v. Persh* (1970) 5 Cal.App.3d 945, 953 [no estoppel against a school district when a written offer was orally affirmed but not ratified or approved by the board as required by statute].) As we have explained, the Contract, which bound Montebello's residents to pay Athens's trash hauling rates, implicated section 40602's salutary purpose of "requiring a city's governing body to make considered decisions on important matters affecting the public fisc." (*Poway,* at p. 1475.) The "doctrine of estoppel is not available to ' "defeat the effective operation of a policy adopted to protect the public." ' " (*City of Fresno v. California Highway Com.* (1981) 118 Cal.App.3d 687, 697.)

Lastly, Athens's estoppel argument rests on the erroneous premise that Athens reasonably relied on the Mayor Pro Tempore's unauthorized execution of the Contract. As this court recently recognized, " 'Persons dealing with a public agency are presumed to know the law with respect to any agency's authority to contract. [Citation.] " 'One who deals with the public officer stands presumptively charged with a full knowledge of that officer's powers, and is bound at his . . . peril to ascertain the extent of his . . . powers to bind the government for which he . . . is an officer . . . .' " [Citation.]' " (*People ex rel. Harris v. Rizzo* (2013) 214 Cal.App.4th 921, 942.) The record shows Athens knew the Mayor Pro Tempore signed the Contract after the City Attorney recommended that the Mayor be deemed absent. As we have explained, neither the City Attorney nor the Mayor Pro Tempore was authorized to unilaterally make that determination. Athens relied on the Mayor Pro Tempore's signature at its peril. Estoppel does not apply.

17

3.    *Councilmember Salazar Was Not Financially Interested in the Contract;*
      *The Trial Court Properly Rejected the Government Code section 1090*
      *Claim*

Though we have concluded the Contract is void because it was not signed by the Mayor in accordance with section 40602, we must nevertheless address Torres's claim in his cross-appeal that Councilmember Salazar violated section 1090 et seq. by participating in the vote to approve the Contract despite her alleged financial interest in it. This is because, apart from declaring a tainted contract void, section 1090 also requires disgorgement of any public funds paid under the contract, without requiring the public entity to restore the benefits it received. (*Finnegan v. Schrader* (2001) 91 Cal.App.4th 572, 583 ["It is settled law that where a contract is made in violation of section 1090, the public entity involved is entitled to recover any compensation that it has paid under the contract without restoring any of the benefits it has received"]; *Carson Redevelopment Agency v. Padilla* (2006) 140 Cal.App.4th 1323, 1336 [where section 1090 is violated, "the disgorgement remedy is automatic"].) Be that as it may, we conclude the trial court reasonably determined that Salazar did not have a financial interest in the Contract.

These are the relevant facts and procedural history: Councilmember Salazar and her husband founded the non-profit drug counseling organization MELA Counseling Services Center (MELA) in 1993. MELA receives its funding from county contracts, grants and private donations. Salazar received an annual salary of $75,000 from MELA, if MELA had sufficient funds to pay the salary. Salazar received at least part of this salary in 10 to 15 of the years MELA has been in operation.

MELA has a five member board of directors. In July 2008, when the City Council was considering the Contract, Athens's executive vice president, Dennis Chiappetta, was one of MELA's directors and Salazar was the chief executive director. Both Chiappetta individually and Athens, at Chiapetta's urging, made donations to MELA at its major annual fundraising fashion show. These annual donations never exceeded $5,000. Funds collected from MELA's private fundraising are held in an account separate from the

18

account used to pay Salazar's salary. When Salazar cast the tie-breaking vote to approve the Contract, she did not disclose that Athens or Chiappetta made donations to MELA.

Based on the evidence presented, the trial court found that "Salazar did not receive any promises from Athens for her vote." Though Salazar received a salary from MELA in some years, the court found there was "no connection" between her salary, Athens's donations, and the Contract. Accordingly, the court concluded she had no financial interest in the Contract under section 1090 et seq.

Section 1090, subdivision (a) provides, in relevant part: "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members." The statute "codifies the long-standing common law rule that barred public officials from being personally financially interested in the contracts they formed in their official capacities." (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1072 (*Lexin*).)

The Legislature has excepted two categories of financial interests, generally referred to as "remote interests" and "noninterests," from section 1090's reach. (*Eden Township Healthcare Dist. v. Sutter Health* (2011) 202 Cal.App.4th 208, 219 (*Eden*).) Section 1091 defines a series of "remote interests" and provides that "[w]here an interest is remote, a board member may comply with section 1090 by making full disclosure of the interest, noted in the entity's official records, and abstaining from voting on the affected contract or influencing other board members in any way." (*Lexin, supra,* 47 Cal.4th at p. 1073.) Section 1091.5, subdivision (a) defines a series of noninterests, under which a public officer "shall not be deemed to be interested in a contract."

"To determine whether section 1090 has been violated, a court must identify (1) whether the defendant government officials or employees participated in the making of a contract in their official capacities, (2) whether the defendants had a cognizable financial interest in that contract, and (3) (if raised as an affirmative defense) whether the cognizable interest falls within any one of section 1091's or section 1091.5's exceptions for remote or minimal interests." (*Lexin, supra,* 47 Cal.4th at p. 1074.) As noted, the trial

19

court focused on the second element, finding Salazar did not have a "financial interest" in the Contract.

"Financial interests prohibited by section 1090 'are not limited to express agreements for benefit and need not be proven by direct evidence. Rather, forbidden interests extend to expectations of benefit by express or implied agreement and may be inferred from the circumstances.' [Citation.]" (*Hub City Solid Waste Services, Inc. v. City of Compton* (2010) 186 Cal.App.4th 1114, 1127.) Nevertheless, while acknowledging direct or indirect interests are equally prohibited, our Supreme Court has instructed that the inquiry is "whether the [official] had a cognizable financial interest *in that contract*." (*Lexin, supra,* 47 Cal.4th at p. 1074, italics added.) "Courts thus generally focus on whether the contract in question could confer some type of pecuniary advantage to the target of a section 1090 inquiry: 'Section 1090 is triggered when a public official *receives any profit from a public contract* and includes the acceptance of a bribe in return for influencing the public entity to enter into a particular contract.' [Citation.] 'The phrase "financially interested" broadly encompasses anything that would *tie a public official's fortunes* to the existence of a public contract.' " (*Eden, supra,* 202 Cal.App.4th at p. 225.) "Put in ordinary, but nonetheless precise, terms, an official has a financial interest in a contract if he might profit from it." (*People v. Honig* (1996) 48 Cal.App.4th 289, 333.)

In his cross-appeal, Torres acknowledges that Salazar had no direct financial interest in the Contract. He nevertheless contends Salazar had a "remote interest" under section 1091, which applies to the interest of "an officer or employee of a nonprofit entity . . . ." (Gov. Code, § 1091, subd. (b)(1).) In view of Salazar's status as an officer of MELA, Torres argues Salazar violated sections 1090 and 1091 by participating in the vote to approve the Contract, while failing to disclose the financial contributions Athens made to MELA. We disagree.

20

As with financial interests under section 1090 generally, section 1091 applies to only a "remote interest *in the contract*." (Gov. Code, § 1091, subd. (a), italics added.) Had the vote concerned a contract with MELA, or had Athens conditioned future contributions to MELA on approval of the Contract, then Salazar, as a MELA officer, would have been subject to section 1091's disclosure and abstention requirements. But MELA was not a party to the Contract and the trial court specifically found, based on the evidence, that "Salazar did not receive any promises from Athens for her vote." MELA simply had no financial interest in the Contract. And, because MELA had no financial interest in the Contract, it follows that Salazar had no remote interest by virtue of her employment as a MELA officer. The trial court properly rejected Torres's claim for violation of section 1090 et seq. (See, e.g., *Eden, supra,* 202 Cal.App.4th at pp. 214-216, 227 [though district official participated in negotiating public contracts with company that employed him as its president and chief executive officer, court found there was "no disqualifying conflict of interest," because there was no evidence of any change in the official's salary, benefits, or status relating to the contracts].)

4.      *A Writ of Mandate Will Not Issue to Compel an Illegal Act; The Trial Court Properly Sustained the City's Demurrer to Athens's Complaint*

Following the trial court's ruling granting Torres's petition, Athens filed its own petition for writ of mandate seeking to compel the Mayor to execute the Contract in accordance with the Government Code. The City responded with a demurrer, which the trial court sustained. Because the residential waste hauling franchise contemplated by the Contract had not been subject to competitive bidding, the court reasoned that it could not compel the Mayor to execute the Contract, as doing so would violate the Montebello Municipal Code.

As noted in our discussion of the facts, in November 2011, Montebello's voters passed the "Residential Solid Waste Franchises Initiative," which was codified as Chapter 8.14 of the Montebello Municipal Code (Chapter 8.14). The stated purpose of Chapter 8.14 "is to ensure that the City Council utilizes a competitive process for awarding residential solid waste franchises." (Montebello Mun. Code, § 8.14.020.)

21

To that end, Chapter 8.14 prohibits the City Council from renewing existing residential solid waste franchises, and requires a competitive bidding process for awarding new franchises. (Montebello Mun. Code, §§ 8.14.030 & 8.14.060.)

Athens contends the trial court erred by invoking Chapter 8.14 to sustain the City's demurrer. Because its writ petition sought to compel the Mayor to comply with a ministerial duty he was charged with years earlier—when the City Council approved the Contract in 2008—Athens argues Chapter 8.14 is irrelevant. We disagree.

The rule is settled that " '[m]andamus will not lie to compel the performance of any act which would be void, illegal or contrary to public policy. [Citation.]' " (*County of San Luis Obispo v. Superior Court* (2001) 90 Cal.App.4th 288, 292 (*San Luis Obispo*); *Cook v. Noble* (1919) 181 Cal. 720, 721.) Because mandamus must operate in the present, an intervening change in law may moot or otherwise make such relief unavailable. (See, e.g., *Consumer Watchdog v. Department of Managed Health Care* (2014) 225 Cal.App.4th 862, 879-880.)

In *San Luis Obispo*, a landowner, Jack Munari, applied to the county for certificates of compliance confirming a prior owner subdivided the subject property into 577 developable lots decades earlier. The county denied the application and Munari petitioned for a writ of mandate compelling the county to issue the certificates. Shortly after Munari filed the action, a trust deed holder foreclosed on his entire interest in the property. (*San Luis Obispo, supra,* 90 Cal.App.4th. at pp. 290-291.) The trial court nevertheless issued the writ of mandate. The Court of Appeal reversed.

The *San Luis Obispo* court explained that, under the Government Code, the county was authorized to issue certificates of compliance to only those persons who had an interest in the subject property, and the "Legislature did not intend such certificates to be issued to someone who has no interest in the land whatsoever." (*San Luis Obispo, supra,* 90 Cal.App.4th. at p. 292.) Although Munari owned the property when he filed the action, the court emphasized the "mortgage foreclosure divested Munari of all interest in the property prior to completion of judicial review of the administrative action." (*Ibid.*)

22

Because mandamus would not lie to compel a presently illegal or void act, the court concluded the foreclosure made it "impossible" for Munari to obtain relief.  (*Ibid.*)

As in *San Luis Obispo*, an intervening event—the Montebello voters' approval of the Residential Solid Waste Franchises Initiative—renders Athens's requested writ relief impossible in this case.  Notwithstanding Athens's allegation that the Mayor had a ministerial duty to execute the Contract *in 2008*, the trial court correctly concluded that this fact did not sanction mandamus relief in the present, given Chapter 8.14's directive to award residential waste hauling franchises only through a competitive bidding process.  Because the residential franchise contemplated by the Contract was not subject to competitive bidding, the City cannot lawfully award the franchise to Athens now.[9]  The trial court properly sustained the City's demurrer.

5.  *Torres Failed to Establish Financial Burden; The Trial Court Properly Exercised Its Discretion to Deny Torres Private Attorney General Fees*

In his cross-appeal, Torres challenges the trial court's ruling denying his request for attorney fees under Code of Civil Procedure section 1021.5.  As our Supreme Court has explained, "eligibility for [Code of Civil Procedure] section 1021.5 attorney fees is established when '(1) plaintiffs' action "has resulted in the enforcement of an important right affecting the public interest," (2) "a significant benefit, whether pecuniary or nonpecuniary has been conferred on the general public or a large class of persons" and (3) "the necessity and financial burden of private enforcement are such as to make the award appropriate." ' " (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1214 (*Whitley*).)  Here, the trial court concluded the first two elements of the *Whitley* test were satisfied; however, because the evidence showed Torres bore no "financial burden" in

---

[9]    In the alternative, Athens points to the severance provision of the Contract and argues the offending residential waste hauling franchise should simply be severed from the rest.  This argument places the proverbial cart before the horse.  The severance provision is binding only if the parties have validly agreed to it.  As we have explained, the City never validly agreed to the severance provision, or any other provision of the Contract, because the Contract was not executed by the Mayor in accordance with the Government Code.

23

litigating the action, the court concluded Code of Civil Procedure section 1021.5 attorney fees were not appropriate. "[A] trial court's ruling on a request for attorney fees under [Code of Civil Procedure] section 1021.5 is reviewed for abuse of discretion." (*Children & Families Com. of Fresno County v. Brown* (2014) 228 Cal.App.4th 45, 57; *Vasquez v. State of California* (2008) 45 Cal.4th 243, 251.) We find no abuse of discretion here.

By its terms, Code of Civil Procedure section 1021.5 "requires a court to consider the 'financial burden of private enforcement' " on the litigant. (*Whitley, supra,* 50 Cal.4th at p. 1217.) "In determining the financial burden on litigants, courts have quite logically focused not only on the costs of the litigation but also any offsetting financial benefits that the litigation yields or reasonably could have been expected to yield. ' "An award on the 'private attorney general' theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake in the matter.' [Citation.]" ' " (*Id.* at p. 1215.) By weighing the financial burdens and incentives involved in bringing the lawsuit, the court can determine " 'whether it is desirable to offer the bounty of a court-awarded fee in order to encourage litigation of the sort involved in [the subject] case.' " (*Id.* at p. 1216.) In making this evaluation, "the court is required to 'realistically assess the litigation and determine, from a practical perspective,' whether or not the statutory requirements have been met." (*Save Open Space Santa Monica Mountains v. Superior Court* (2000) 84 Cal.App.4th 235, 254 (*Save Open Space*), citing *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 938.) As part of this assessment, the court may consider evidence that the named plaintiff is litigating the action primarily for the benefit of nonlitigants with a financial interest in the outcome. (See *Save Open Space,* at p. 254.)

In this case, viewing all the evidence presented after two rounds of briefing on Torres's attorney fee motion, the trial court concluded Torres "had no financial interest in the outcome, either from a benefit point of view *or from a cost point of view*." (Italics added.) Rather, the court found, "Torres' attorneys' fees were paid by the Los Angeles County Environmental Business Association ('LACEBA'), an organization of Athens'

24

trash hauler competitors." The court explained that Torres's attorney "told him he needed to go to LACEBA," and once he obtained an agreement from LACEBA to pay the attorney fees, "[t]hey 'took over' " and "[t]hey paid for all of it." Thus, from Torres's perspective, there was no cost-benefit analysis. In the trial court's words, "Torres is not a petitioner who wished to pursue a lawsuit, found an attorney, and then also found a collateral source of funding for his attorneys' fees." On the contrary, the court found, "this lawsuit would not have been filed without LACEBA's agreement to pay Torres' attorneys' fees." Under these circumstances, the trial court determined awarding fees to Torres—who bore no financial burden in bringing the case—would not advance Code of Civil Procedure section 1021.5's purposes.

Torres argues he still is entitled to attorney fees, even if his "cost is zero," because he had "no financial interest in the outcome of the litigation." Torres draws support for the contention from a statement by our Supreme Court in *Whitley*, wherein the court, reciting a "method for weighing costs and benefits" articulated in *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1 (*Police Protective League*), stated: " '[A] bounty will be appropriate except where the expected value of the litigant's own monetary award exceeds by a substantial margin the actual litigation costs.' " (*Whitley, supra,* 50 Cal.4th at p. 1216.) Torres maintains this statement establishes a bright line rule mandating an award of attorney fees whenever a plaintiff has no financial interest in the litigation. As Torres puts it: "When your financial interests are zero, those interests cannot exceed the 'actual costs of litigation' by a substantial margin." We are not convinced.

To begin, notwithstanding the quotation from *Police Protective League*, the *Whitley* decision repeatedly emphasizes the "problem of affordability of lawsuits," which Code of Civil Procedure section 1021.5 was intended to address. (*Whitley, supra,* 50 Cal.4th at p.1219.) The Supreme Court explained, "Section 1021.5 addresses this affordability problem with the inducement of attorney fees for public interest litigation when certain conditions in the statute are met. Stated another way, the Legislature that enacted [Code of Civil Procedure] section 1021.5 was not so much concerned with what

25

brought a litigant with a potential public interest case into an attorney's office, but rather with allowing that litigation to move forward from there by offering at least the prospect that the financial burden of the litigation could be shifted to the opposing party if the litigant prevailed." (*Whitley,* at p. 1220.)

As *Whitley* explains, the Legislature's focus was not whether the litigant expected some benefit or no benefit; the Legislature was concerned with ensuring that the problem of affordability would not dissuade private citizens from bringing litigation that could benefit the public. Thus, not surprisingly, the Legislature specifically required a finding of "financial burden" for attorney fees to be awarded. (Code Civ. Proc., § 1021.5 [a court may award attorney fees if, inter alia, "the necessity and *financial burden* of private enforcement . . . are such as to make the award appropriate"], italics added.) In contrast, the litigant's "offsetting financial benefits" are a consideration courts have appended to the financial burden analysis. (*Whitley, supra,* 50 Cal.4th at p 1215.) The Legislature's emphasis on financial burden over financial interest suggests a rule opposite to the one advanced by Torres—that is, if the litigant bears no financial burden, Code of Civil Procedure section 1021.5 attorney fees are inappropriate, regardless of the existence or nonexistence of a financial interest.

Moreover, the issue in *Whitley* did not concern the appropriate test for weighing financial costs against financial interests. The issue was whether a *nonfinancial* interest—in that case, the plaintiff's personal interest in her developmentally disabled brother's living arrangement—should ever be weighed against the plaintiff's financial burden in pursuing the litigation. (*Whitley, supra,* 50 Cal.4th at p. 1211.) The Supreme Court concluded "a litigant's personal nonpecuniary motives may not be used to disqualify that litigant from obtaining fees under Code of Civil Procedure section 1021.5." (*Whitley,* at p. 1211.) The quotation from *Police Protective League*— comparing the litigant's expected " '*monetary* award' " to the " 'actual costs of litigation' "—served to underscore the point that *nonpecuniary* interests are not a valid consideration. (*Whitley*, at p. 1216, italics added.) However, there is no indication in *Whitley* that the Supreme Court intended this statement to govern a situation like the

26

present one, where a nonlitigant organization—that cannot move for Code of Civil Procedure section 1021.5 fees in its own name—agreed from the outset to pay all the costs of litigation for the named plaintiff.

Indeed, the trial court astutely drew that very distinction here. Commenting on the relationship between Torres and LACEBA, the court remarked: "I thought about, well, why isn't this just a collateral source situation where with Mr. Torres goes to court, he files a lawsuit, he's interested in the outcome, and he happens to have a funding source. Well, Athens shouldn't get the benefit of the fact that Mr. Torres has this nice funding source off to the side. . . . [T]hat would be a windfall to Athens. . . . But it seemed to me that a 'but for' analysis applies here. It's not that Mr. Torres got a nice funding source off to the side. *It's that this lawsuit never would have been filed without that funding source being willing to pay. . . . Why should you [LACEBA] get to hide behind the petitioner [Torres] and then recover your attorneys fees. If you want to be the petitioner, be the petitioner. If you want to be the funding source, be the funding source, but don't expect to be reimbursed under the Private Attorney General Statute*." (Italics added.) We agree.

Here, any one of Athens's competitors that comprised LACEBA could have brought the writ petition challenging the Contract. Had these competitors succeeded in establishing that their actual costs of litigation transcended their expected monetary benefit, they would have been entitled to attorney fees under Code of Civil Procedure section 1021.5. But these same competitors cannot obscure their financial interest in the litigation by choosing to fund Torres, who bore no "financial burden" in bringing this case (Code Civ. Proc., § 1021.5), then claim, in Torres's name, a right to reimbursement for their attorney fees under the private attorney general statute. (See *Save Open Space, supra,* 84 Cal.App.4th at pp. 254.) The trial court acted reasonably and within its discretion in denying the request for Code of Civil Procedure section 1021.5 attorney fees.

27

## DISPOSITION

The judgment in favor of Torres and the order denying Torres's motion for private attorney general fees under Code of Civil Procedure section 1021.5 are affirmed. The judgment entered after the order sustaining the City's demurrer to Athens's complaint also is affirmed. In the interest of justice, Athens and Torres shall bear their own costs.

**CERTIFIED FOR PUBLICATION**

KITCHING, J.

We concur:

EDMON, P. J.

ALDRICH, J.

28